FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RIVKO KNOX,
             *Plaintiff-Appellant*,

v.

MARK BRNOVICH, Attorney
General, in his official capacity
as Arizona Attorney General,
             *Defendant-Appellee.*

No. 18-16613

D.C. No.
2:18-cv-02089-DLR

OPINION

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted October 3, 2018
San Francisco, California

Filed October 31, 2018

Before: Sidney R. Thomas, Chief Judge, and
Carlos T. Bea and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's denial of a preliminary injunction and its bench trial judgment in an action facially challenging HB 2023, Arizona's 2016 election law prohibiting certain persons from collecting voters' early mail ballots.

Under HB 2023, a person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony. An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties. Family members, household members, and caregivers of the voter are exempted from this general prohibition against collecting ballots.

The panel held that HB 2023 is not preempted by federal laws regulating the United States Postal Service. The panel determined that the presumption against preemption applied in this instance because state regulation of early voting procedures was not "an area where there has been a history of significant federal presence," and that plaintiff failed to rebut this presumption.

The panel held that HB 2023 does not implicate the First Amendment rights of ballot collectors like plaintiff. The

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel determined that plaintiff failed to carry her burden of demonstrating that the conduct of collecting ballots would reasonably be understood by viewers as conveying any of plaintiff's expressive messages or conveying a symbolic message of any sort.

Finally, the panel rejected plaintiff's claim that HB 2023 violates her right to due process under the Fifth Amendment because it is an overly vague criminal statute. The panel held that HB 2023 provides fair notice of prohibited conduct and that because the scope of HB 2023 was clear, it posed no significant threat of arbitrary enforcement.

## COUNSEL

Spencer G. Scharff (argued), Scharff PLC, Phoenix, Arizona; Roopali H. Desai, Coppersmith Brockelman PLC, Phoenix, Arizona; for Plaintiff-Appellant.

Andrew G. Pappas (argued), Assistant Solicitor General; Joseph E. La Rue and Kara M. Karlson, Assistant Attorneys General; Dominic E. Draye, Solicitor General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendant-Appellee.

**OPINION**

IKUTA, Circuit Judge:

Rivko Knox brings a facial challenge to H.B. 2023, Arizona's 2016 election law prohibiting certain persons from collecting voters' early mail ballots. We conclude that H.B. 2023 is not preempted by federal laws regulating the United States Postal Service, does not violate the First Amendment's protection of speech, and is not an unconstitutionally vague criminal statute. Accordingly, we affirm.

I

Arizona law permits "[a]ny qualified elector" to "vote by early ballot," Ariz. Rev. Stat. § 16-541(A), in addition to voting in person on Election Day. Voters can either mail in early ballots or drop them off at an on-site early voting location in the 27 days leading up to an election. *See id*. § 16-542(D). Voters choosing to return their early ballots by mail need not pay any postage, but their ballots must be received by 7:00 p.m. on Election Day. *Id*. §§ 16-542(C), 16-548(A).

Arizona has placed various restrictions on possession of early ballots. In 1992, Arizona prohibited any person other than the voter from possessing an unvoted absentee ballot. *See* 1991 Ariz. Legis. Serv. ch. 310, § 22 (S.B. 1390) (West). Arizona later extended this prohibition to unvoted early ballots of any type, *see* 1997 Ariz. Legis. Serv. ch. 5, § 18 (S.B. 1003) (West) (codified at Ariz. Rev. Stat. § 16-542(D)). In 2016, Arizona imposed restrictions on the collection of early ballots. Under H.B. 2023:

> H. A person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony. An election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties.

Ariz. Rev. Stat. § 16-1005(H). Family members, household members, and caregivers of the voter are exempted from this general prohibition against collecting ballots. *Id*. § 16-1005(I).

Rivko Knox has been a Democratic precinct committeeperson (an elected position) for the Acacia Precinct since 2004.[1] Knox engages in door-to-door canvassing of prospective voters to educate, register, and encourage them to vote. As part of her canvassing, Knox often encourages prospective voters to watch for their early ballot to arrive, to complete it, and to mail it back. Before the 2016 election cycle, Knox "accepted and delivered at least one voted ballot for a voter that [she] met while canvassing [prospective voters], and who requested that [she] deliver their early ballot."

Knox states that "[a]ssisting voters with the delivery of their early ballots was, and continues to be, a part of expressing [her] political belief that all registered voters have an opportunity to use their franchise." Through the act of

---

[1] This undisputed factual background is drawn from Knox's declaration in support of her motion for a preliminary injunction.

collecting and delivering individuals' voted early ballots, Knox intends to communicate the message that she "support[s] the continued and widespread use of voting by mail, and that the United States' postal system provides a secure and easy platform to exercise the franchise and conduct elections."  Knox also intends her conduct to communicate the message that "voting is the most fundamental right in a democratic society and that [she is] committed to helping qualified electors exercise their right to vote regardless of *who* they vote for."

Prior to the 2016 election cycle, Knox was willing to assist voters who asked her to deliver their voted early ballot to a United States mail receptacle or other appropriate ballot drop-off location.  Since H.B. 2023 went into effect, she understands that she is "prohibited from collecting and delivering another person's early ballot."  Knox is now "very careful not to offer to deliver or accept for delivery another person's early ballot, even if they ask for [her] assistance."

After H.B. 2023 was enacted, Knox canvassed prospective voters for a candidate seeking election in the special election for Congressional District 8.  During those efforts, Knox encountered several voters who had not yet mailed their early ballots.  Knox felt compelled to "censor [herself] by not offering to collect and deliver" their early ballots.  Instead, Knox encouraged them "not to place their ballots in the mail because it was too late and, instead, to deliver their ballots to an appropriate location before the polls closed."

Knox plans to canvass prospective voters again in the upcoming 2018 election and would like to collect and deliver voted mail-in ballots, but fears doing so because of H.B. 2023

and the state's "threats to strictly enforce H.B. 2023." But for H.B. 2023, Knox "would affirmatively offer to deliver early ballots for voters . . . or, at a minimum, [] would be willing to oblige a voter who requested that [she] deliver his or her ballot."

Knox filed this lawsuit in district court, claiming that H.B. 2023 is facially invalid because it: (1) was preempted by federal law under the Supremacy Clause; (2) violated speech rights protected by the First Amendment as applied to the states by the Fourteenth Amendment; and (3) was void for vagueness because of its failure to define when a person is deemed to have collected an early ballot in violation of the Due Process Clause. In her concurrent motion for a preliminary injunction, Knox asked the court for expedited relief and to consolidate the hearing on her motion for a preliminary injunction with a trial on the merits. *See* Fed. R. Civ. P. 65(a)(2). After holding a consolidated preliminary injunction hearing and bench trial, the district court denied Knox's motion for a preliminary injunction and ruled against her on all three of her claims.

Knox timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.[2] We review the district court's conclusions of law de novo and review its findings of fact for clear error.

---

[2] Knox has standing to bring these claims. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). Although Knox has not violated H.B. 2023 or been made subject to its penalties, she alleges she was forced to modify her speech and behavior to comply with H.B. 2023. This self-censorship in response to a reasonable fear of prosecution constitutes an injury in fact that would be redressed by a declaration that H.B. 2023 is unconstitutional. *See Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003).

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1067 (9th Cir. 2008) (en banc).

## II

We begin with Knox's claim that H.B. 2023 is preempted by the federal postal monopoly, as set forth in the Private Express Statutes, a series of provisions establishing a monopoly for the U.S. Postal Service, 18 U.S.C. §§ 1693–1696; 39 U.S.C. §§ 401, 601–606, and their implementing regulations, 39 C.F.R. §§ 310, 320. To succeed on such a facial challenge, Knox "must show that 'no set of circumstances exists under which the [state] Act would be valid.'" *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

## A

We first outline the legal framework for determining when a state statute is preempted. The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "This means that when federal and state law conflict, federal law prevails and state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). In determining Congress's intent, we start "with the basic assumption that Congress did not intend to displace

state law," *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981), and that federal law does not supersede "the historic police powers of the States" unless "that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quoting *Lohr*, 518 U.S. at 485). This presumption against preemption applies when a state regulates in an area of historic state power even if the law "touche[s] on" an area of significant federal presence. *Puente*, 821 F.3d at 1104 n.5 (citing *Wyeth*, 555 U.S. at 565 n.3). In *Puente*, for instance, although Arizona's identity-theft laws had undisputed "effects in the area of immigration," we held there was a presumption against preemption because "the text of the laws regulate[d] for the health and safety of the people of Arizona." *Id*. (citing *Lohr*, 518 U.S. at 475). By contrast, there is no presumption against preemption when the State regulates in an area such as "national and international maritime commerce," where "the federal interest has been manifest since the beginning of our Republic and is now well established." *United States v. Locke*, 529 U.S. 89, 99 (2000).[3]

In determining congressional intent, we first consider whether Congress made its intent to preempt state law clear through express language in a statute. *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015). Even when a statute does not expressly refer to preemption, Congress may implicitly preempt state legislation through either field preemption or conflict preemption. *Id.*

---

[3] Although some Justices have cast doubt on the continued viability of the presumption against preemption, *see PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621–23 (2011) (plurality opinion), the Supreme Court has not yet abandoned this principle. *See Arizona v. United States*, 567 U.S. 387, 400 (2012); *see also CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2188–89 (2014).

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 138 S. Ct. at 1480 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cty.*, 479 U.S. 130, 140 (1986)). In other words, courts will infer that Congress intended "to displace state law altogether" when Congress enacts "a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (internal quotations and ellipses omitted) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "The essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme." *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 734 (9th Cir. 2016). Because "Congress must clearly manifest an intention" to "enter and completely absorb the field" in order to preclude state regulation in that field, *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 97 (1945), it is necessary to delineate "the pertinent regulatory field" with specificity, *Nat'l Fed'n*, 813 F.3d at 734.

In some limited circumstances where the overall field appears to be federally regulated, "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un* regulated, and in that event would have as much pre-emptive force as a decision *to* regulate." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983). Thus, Congress can impliedly create a "federally mandated free-market" area that must be left unregulated by any state enactments. *P.R.*

*Dep't. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 500 (1988). But such an unregulated zone is "decidedly untypical" and cannot be "created subtly." *Id.* Courts consider the "language, history, or policy of" the relevant federal law to determine whether Congress purposefully acted to perpetuate a "regulatory gap." *See Ark. Elec.*, 461 U.S. at 384.

Conflict preemption is narrower than field preemption. Under conflict preemption principles, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Courts have found conflict preemption in two situations: [1] "where compliance with both state and federal law is impossible, or [2] where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc.*, 135 S. Ct. at 1595 (internal quotation marks omitted). A state law may stand as "an obstacle to the regulatory system Congress chose" if Congress chooses a specific method of enforcement to achieve federal goals, and a state law adopts a different enforcement method that interferes with "the careful balance struck by Congress." *Arizona*, 567 U.S. at 406. If Congress has not adopted a comprehensive regulatory program in a specific area, however, the state has "authority to pass its own laws on the subject." *Id.* at 404. For instance, at a time when Congress had expressed no more than "a peripheral concern" regarding the employment of aliens not entitled to lawful residence in the United States, a state had broad authority to impose civil penalties on such employment. *Id.* (quoting and distinguishing *De Canas v. Bica*, 424 U.S. 351, 360 (1976)). After Congress later enacted "a comprehensive framework for combating the employment of illegal aliens," a similar

state enactment interfered with Congress's purposes and was therefore preempted. *Id*. (internal quotation marks omitted).

B

Because the preemptive scope of the Private Express Statutes depends on Congress's intent, *Wyeth*, 555 U.S. at 566, we now consider the scope and purpose of these statutes and their implementing regulations, 39 C.F.R. §§ 310, 320.

"Since its establishment, the United States Postal Service has exercised a monopoly over the carriage of letters in and from the United States." *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 519 (1991). This monopoly has "always been limited to the carriage of mail for hire," and did not extend to the "private, gratuitous carriage" of mail. *Regents of Univ. of Cal. v. Pub. Emp't Relations Bd.*, 485 U.S. 589, 597 (1988).

Congress enacted the first statute limiting private carriage in 1792. *Air Courier*, 498 U.S. at 526. "In 1825 and 1827, Acts were passed prohibiting the private carriage of letters through the use of stages or other vehicles, packet boats, or other vessels, § 19, ch. 64 of Act of March 3, 1825, 4 Stat. 107, and foot and horse posts, § 3, ch. 61 of Act of March 2, 1827, 4 Stat. 238." *Id.* In 1845, Congress enacted "An Act to reduce the rates of postage, to limit the use and correct the abuse of the franking privilege, and for the prevention of frauds on the revenues of the Post Office Department," which significantly revised the Private Express Statutes. *Id*; Act of Mar. 3, 1872, ch. 43, 5 Stat. 732. According to the Supreme Court, Congress was motivated to enact the 1845 Act by a concern that "the Post Office Department continued to run substantial deficits in spite of high postage rates." *Air*

*Courier*, 498 U.S. at 526. Congress recognized that the Postal Service had a duty "to serve outlying, frontier areas, even if it meant doing so below cost," in order "to achieve national integration and to ensure that all areas of the Nation were equally served by the Postal Service." *Id.* at 527. Congress believed the Postal Service's shaky financial situation was primarily caused by competition from private companies, which had not been successfully prosecuted under the 1825 and 1827 Acts. *Id.* These competitors undercut the Postal Service's prices on low-cost routes and left it with only "high-cost routes and insufficient means to fulfill its mandate of providing uniform rates and service to patrons in all areas, including those that are remote or less populated." *Id.* at 519. The best way to address these concerns, Congress decided, was "driving private expresses out of business and increasing mail volume of the Post Office" in order to protect the Postal Services's revenues and ensure it could fulfill its mission. *Id.* at 527. Accordingly, the 1845 Act included a broad prohibition on private carriage aimed at strengthening the postal monopoly. Act of Mar. 3, 1872, ch. 43, § 9, 5 Stat. 732. In its modern form, the prohibition on private carriage reads:

> Whoever establishes any private express for the conveyance of letters or packets, or in any manner causes or provides for the conveyance of the same by regular trips or at stated periods over any post route which is or may be established by law, or from any city, town, or place to any other city, town, or place, between which the mail is regularly carried,

shall be fined not more than $500 or imprisoned not more than six months, or both.

18 U.S.C. § 1696(a).**[4]**

While ensuring that courier services could not "compet[e] selectively with the Postal Service on its most profitable routes," *Air Courier*, at 527–28, the Private Express Statutes did not purport to regulate conduct that did not affect revenues. Most important here, the 1845 Act carved out a "private hands" exception, which provided that the Private Express Statutes "shall not prohibit the conveyance or transmission of letters or packets by private hands without compensation." 18 U.S.C. § 1696(c). This exception was "a reflection of the limited nature of the monopoly; it was designed to ensure that private carriage is not undertaken 'for hire or reward.'" *Regents*, 485 U.S. at 597 (citation omitted).

The 1845 Act permitted other exceptions to the postal monopoly that did not threaten postal revenues. Section 1696(a) provides that the Private Express Statutes do not "prohibit any person from receiving and delivering to the nearest post office, postal car, or other authorized depository for mail matter any mail matter properly stamped." 18 U.S.C. § 1696(a). Section 1694 allows businesses to operate an internal mail system by carrying letters that relate "to the

---

**[4]** In 1872, Congress reenacted the Private Express Statutes and updated its wording without making any substantive changes. Roger P. Craig & William T. Alvis, *The Postal Monopoly: Two Hundred Years of Covering Commercial as Well as Personal Messages*, 12 U.S.F. L. Rev. 57, 74–76 (1977). *Compare* Act of Mar. 3, 1872, ch. 43, § 9, 5 Stat. 732, *with* Act of June 8, 1872, ch. 335, § 228, 17 Stat. 283 (current version at 18 U.S.C. § 1696). The Private Express Statutes have not substantially changed since the 1872 recodification. Craig & Alvis, *supra*, at 77.

current business of the carrier." 18 U.S.C. § 1694; *Regents*, 485 U.S. at 594. And Section 1696(c) allows any "special messenger employed for the particular occasion only" to transmit letters. 18 U.S.C. § 1696(c).

The Postal Regulatory Commission's subsequent regulations to enforce the Private Express Statutes did not alter this approach to the scope of the Postal Service's monopoly. *See* 39 C.F.R. §§ 310.1–310.7. The regulations reiterate the Private Express Statutes' prohibition on carriage for hire on postal routes, *see* 39 C.F.R. § 310.2(a), while formalizing the statutory exceptions for uncompensated carriage of mail.[5] The Postal Reorganization Act of 1970 later made additional exceptions to the postal monopoly for compensated carriage, including authorizing the Postal Regulatory Commission to suspend the postal monopoly for services described by regulation. 39 U.S.C. § 601(b).[6]

---

[5] 39 C.F.R. §§ 310.2(d)(2), 310.3(b) (permitting delivery of letters of the carrier); *id.* §§ 310.2(d)(3), 310.3(c) (permitting delivery of letters transmitted without compensation); *id.* §§ 310.2(d)(4), 310.3(d) (permitting delivery of letters transmitted by special messenger employed for the particular occasion only); *id.* §§ 310.2(d)(4), 310.3(e) (permitting delivery of letters carried prior or subsequent to mailing).

[6] The relevant regulations provide for suspension of the postal monopoly for certain limited activities. *See* 39 C.F.R. § 320.2 (data processing materials); *id.* § 320.4 (certain letters of college and university organizations); *id.* § 320.5 (certain international-ocean carrier-related documents); *id.* § 320.6 (extremely urgent letters); *id.* § 320.7 (advertisements accompanying parcels or periodicals); *id.* § 320.8 (international remailing).

C

We now turn to Knox's claim that the Private Express Statutes and their implementing regulations implicitly preempt H.B. 2023 through either field preemption or conflict preemption and that there is no set of circumstances under which H.B. 2023 would be valid.

We begin by considering whether the presumption against preemption applies in this context. We conclude that it does, because state regulation of early voting procedures is not "an area where there has been a history of significant federal presence." *Locke*, 529 U.S. at 108. Although H.B. 2023 touches on the broader field of letter carriage and delivery, such incidental effects in an area of federal interest is not enough to overcome the presumption against preemption. *See Puente*, 821 F.3d at 1104 n.5 (citing *Wyeth*, 555 U.S. at 565 n.3). Therefore, our analysis must focus on whether Knox rebutted this presumption.

We first consider Knox's field preemption claim. Our precedent requires us to begin by "delineat[ing] the pertinent regulatory field" Congress intended to occupy by enacting the Private Express Statutes. *Nat'l Fed'n*, 813 F.3d at 734. The Supreme Court has already established that the Private Express Statutes regulate "the conduct of competitors of the Postal Service," *Air Courier*, 498 U.S. at 528 n.5, and does not address the uncompensated carriage of mail, which poses no threat to the Post Office's revenues, *see Regents*, 485 U.S. at 597.

H.B. 2023 does not regulate within this field of mail carriage for hire; rather, it explicitly exempts any "United States postal service worker . . . engaged in official duties"

from regulation. Ariz. Rev. Stat. § 16-1005(H). On its face, therefore, the Private Express Statutes do not implicitly preempt H.B. 2023 through field preemption.

To avoid this conclusion, Knox raises two arguments. First, Knox argues that H.B. 2023 regulates the carriage of mail for hire because it does not prohibit election officials and caregivers from collecting ballots, and such individuals receive salaries for performing their jobs. This argument fails. H.B. 2023 does not regulate the ballot-collection activities of election officials or caregivers, but merely exempts them from the state statute's prohibition. Moreover, such individuals are not collecting ballots for a fee in competition with the Postal Service; rather, their collection of ballots is merely an incidental part of their jobs.

Second, Knox urges us to read the Private Express Statutes as expressing a clear and manifest intent to occupy the broadly defined field of letter carriage and delivery generally, leaving no room for state regulation of compensated or uncompensated mail carriers. According to Knox, by declining to prohibit uncompensated carriage of mail, Congress intended to prevent regulation of any sort, state or federal, in this area. *See Isla Petroleum*, 485 U.S. at 500. In support of this argument, Knox points to the regulatory exceptions to the Private Express Statutes that permit specified conduct, and claims that the language providing that certain conduct is "permitted," 39 C.F.R. § 310.2(d), or "permissible," *id.* § 310.3, indicates Congress's intent to leave the permitted conduct unregulated by the state.[7]

---

[7] Knox also notes other regulations that suspend the postal monopoly for specified conduct, 39 C.F.R. §§ 320.1–320.9.

We reject this argument.  The Supreme Court made clear that Congress did not intend to regulate the uncompensated carriage of mail; Congress's sole concern was preventing competitors from reducing the Post Office's revenues.  *See Regents*, 485 U.S. at 597–98.  The regulations cited by Knox are consistent with Congress's focus on competitors rather than on the field of mail carriage as a whole; they provide that the postal monopoly does not apply to a limited range of activities that do not pose a competitive threat to the Post Office.  Carving out specified conduct from a broad prohibition is not equivalent to regulating that conduct or ensuring that such conduct may proceed unregulated.  Given the presumption against preemption, the Postal Commission's regulations are best read as withdrawing from part of a field, rather than occupying it.  Because Congress has not made a clear and manifest determination that uncompensated carriage of mail should be left unregulated by states as well as federal authorities, *see Ark. Elec.*, 461 U.S. at 383, we conclude that Congress did not implicitly preempt the field of uncompensated carriage of mail.[8]

---

[8] Knox also claims that Congress expressed its intent to regulate the field of uncompensated carriage of mail by criminalizing interference with mail carriers.  *See, e.g.*, 18 U.S.C. § 1702 (prohibiting taking any letter "from a letter or mail carrier" with design to "obstruct the correspondence" or pry into the business of another); *see also* 18 U.S.C. § 1708 (prohibiting theft or receipt of stolen letter "from a letter or mail carrier").  We reject this argument.  On their face, the criminal statutes cited by Knox apply to interference with mail that is in the U.S. Postal Service's custody (whether from a post office, mail depository, or other receptacle, or in the custody of letter or mail carriers), not to the private carriage of mail.  Nor have we found any case interpreting the statute as applying to uncompensated letter carriers, as Knox asserts.  The cases cited by Knox are inapposite here, as they apply the statutes to defendants who have interfered with mail that has been deposited in a U.S. mail

We next turn to Knox's conflict preemption arguments, and consider whether H.B. 2023 is preempted because it conflicts with the Private Express Statutes and other postal regulations.  Knox does not argue that compliance with H.B. 2023 and federal law is impossible.  *Oneok, Inc.*, 135 S. Ct. at 1595.  Rather, she argues that H.B. 2023 stands as an obstacle to the operation of comprehensive federal postal laws.  *Id.*

First, Knox contends that H.B. 2023 obstructs Congress's objective of ensuring efficient delivery of the mail.  We disagree.   State laws may obstruct the federal postal monopoly "where state regulation involved a direct, physical interference with federal activities under the postal power or some direct, immediate burden on the performance of the postal functions."  *Corsi*, 326 U.S. at 96.  Applying this principle, we have held that a local ordinance that required postal letter carriers to "obtain express consent from residents before crossing their lawns in the course of mail delivery" was preempted by federal regulations that "authorize[d] postal carriers to cross lawns unless the owner objects." *United States v. City of Pittsburg, Cal.*, 661 F.2d 783, 784–85 (9th Cir. 1981).  Because the local "ordinance interfere[d] with postal carriers' federal duty to deliver the mail efficiently" it was therefore unconstitutional.  *Id.* at 786.  No such conflict is present here: H.B. 2023's prohibitions regarding the collection of voters' early ballots exempt federal postal officials and therefore do not interfere with any federal activities under Congress's postal power.  Because H.B. 2023 exempts federal postal workers from regulation, it does not frustrate Congress's objectives in enacting the

receptacle.  *See United States v. Childs*, 598 F.2d 169, 172 (D.C. Cir. 1979); *United States v. Wade*, 364 F.2d 931, 934 (6th Cir. 1966).

Private Express Statutes; namely, to protect the postal monopoly and its ability to generate revenue. *Air Courier*, 498 U.S. at 525–26.

Next, Knox notes that the Postal Regulatory Commission has promulgated regulations that suspend the postal monopoly for the delivery of "extremely urgent letters," 39 C.F.R. § 320.6, which is relied on by private carriers such as FedEx and DHL. Knox argues that H.B. 2023 conflicts with federal law because it would prohibit such private carriers from accepting a ballot for delivery, despite the authorization under federal regulation. We reject this argument for substantially the same reason we rejected her similar argument in the field preemption context. Congress's purpose in enacting the Private Express Statutes was to protect the Postal Service's revenues, and a state statute that prohibits private carriers from collecting state ballots does not stand as an obstacle to the accomplishment of Congress's purpose. Under the presumption against preemption, we decline to interpret a federal regulation withdrawing a federal prohibition on certain types of private carriage as conflicting with a state statute imposing a different prohibition on that carriage.

We also reject Knox's argument that H.B. 2023 obstructs Congress's goal of achieving "national integration" because it precludes individuals from offering more efficient methods of early-ballot delivery. This theory is directly contrary to the Supreme Court's analysis of the Private Express Statutes. According to the Supreme Court, Congress's goal of achieving national unity required the Postal Service to reach all the far-flung reaches of the nation. *Air Courier*, 498 U.S. at 528. In order to ensure the Postal Service could generate sufficient revenues to accomplish this mission, Congress

decided to eliminate its competition. *Id.* Congress did not consider whether private, uncompensated delivery of mail might provide more efficient delivery to remote areas; its only intent was to enhance the Postal Service's revenues so it could discharge its duty of providing delivery to such areas.

Finally, we reject Knox's argument that by imposing penalties on the uncompensated carriage of letters, H.B. 2023 is an obstacle to the regulatory system chosen by Congress in enacting the Private Express Statutes. *See Arizona*, 567 U.S. at 405–06. Because Congress did not choose to regulate uncompensated carriers in the Private Express Statutes, a state has "authority to pass its own laws on the subject." *Id.* at 404. Because H.B. 2023 imposes penalties on individuals excluded from Congress's regulatory scheme, it does not conflict with that regulatory scheme.

Because Congress has not implicitly preempted H.B. 2023 through field or conflict preemption, we conclude that H.B. 2023 is not preempted by federal law.[9]

### III

We next consider Knox's claim that H.B. 2023 violates the First Amendment, made applicable to the states through

---

[9] We also reject Knox's argument that Congress has superseded H.B. 2023 pursuant to its authority under the Elections Clause, U.S. Const. art. I, § 4, cl. 1, because Knox failed to raise this argument distinctly on appeal. *Hilo v. Estate of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir. 1996). Further, Knox fails to identify any federal statute where "Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections," let alone one which supersedes Arizona's early-ballot-collection law. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013).

the Fourteenth Amendment, by burdening freedom of speech. In the First Amendment context, a party bringing a facial challenge need show only that "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).[10]

The First Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend I.  "While [t]he First Amendment literally forbids the abridgment only of speech, the Supreme Court has long recognized that its protection does not end at the spoken or written word." *United States v. Swisher*, 811 F.3d 299, 310–11 (9th Cir. 2016) (internal quotation marks omitted) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).  A message "delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative" is symbolic speech protected by the First and Fourteenth Amendments. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294, (1984); *see also Texas*, 491 U.S. at 404.  Applying this principle, the Supreme Court has held that burning an American flag as part of a demonstration, *Texas*, 491 U.S. at 406, wearing a black armband to protest the Vietnam war, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969), and "a sit-in by blacks in a 'whites only' area to

---

[10] Because Knox seeks a declaration "that H.B. 2023 is unconstitutional in its entirety" and an injunction preventing enforcement of the statute for any purpose, we construe her claims as making a facial challenge, *see John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010), even though some of her arguments are specific to her own circumstances.

protest segregation," *Texas*, 491 U.S. at 404 (citing *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966)), constitute expressive conduct protected by the First Amendment.

Nevertheless, the Court has rejected the concept that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Rather the First Amendment protects only conduct that "is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999) (quoting *Texas*, 491 U.S. at 404). Because the Court has eschewed a rule that "all conduct is presumptively expressive," individuals claiming the protection of the First Amendment must carry the burden of demonstrating that their nonverbal conduct meets the applicable standard. *Clark*, 468 U.S. at 293 n.5.

Knox argues that the act of collecting early ballots is expressive conduct. Knox's sworn declaration states that her conduct in collecting early ballots communicates the message that she "support[s] the continued and widespread use of voting by mail, and that the United States' postal system provides a secure and easy platform to exercise the franchise and conduct elections," and that "voting is the most fundamental right in a democratic society and that [she is] committed to helping qualified electors exercise their right to vote regardless of *who* they vote for." We conclude that she has not carried her burden of demonstrating that the conduct of collecting ballots would reasonably be understood by viewers as conveying any of these messages or conveying a symbolic message of any sort. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (rejecting argument

that collecting voter registration documents is inherently expressive conduct).

Knox also claims that H.B. 2023 is analogous to laws that burden the ability of individuals to make campaign contributions or to deliver information through the mail and therefore raises First Amendment concerns. We disagree; none of Knox's analogies are apposite. While restrictions on "the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression," *Buckley v. Valeo*, 424 U.S. 1, 19 (1976), H.B. 2023 does not limit the ability of would-be ballot collectors to communicate their messages in any comparable way. Further, prohibitions against using the mails to communicate specified types of information (such as laws prohibiting sending or receiving pornography or seditious literature through the mail) may raise serious First Amendment issues. *Blount v. Rizzi*, 400 U.S. 410, 428 (1971); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 305 (1965). But courts have extended such protection to the senders and recipients of mail, *Currier v. Potter*, 379 F.3d 716, 727 (9th Cir. 2004), never to the carriers of other people's mail.

Further, Knox's reliance on *Bartnicki v. Vopper*, 532 U.S. 514, 517–19, 526–27 (2001), which held that the delivery of a newsworthy recording to the media was protected by the First Amendment, is also misplaced. In *Bartnicki*, the Supreme Court acknowledged that the delivery of a tape recording of illegally intercepted conversations to a radio commentator "might be regarded as conduct," but reasoned that in context it was "the kind of 'speech' that the First Amendment protects." *Id*. at 527. According to the Court, the purpose of the delivery was "to provide the recipient with

the text of recorded statements," analogizing such conduct to the act of disclosing and publishing the information. *Id*. This rationale does not apply to the delivery of a voter's early ballot, which is not conduct analogous to the disclosure and publication of newsworthy information. Although voted early ballots constitute the voter's speech, Knox "does not 'speak' in this context by handling another person's 'speech.'" *Steen*, 732 F.3d at 390 (rejecting the argument that a third party's collection and delivery of a voter's completed registration application constitutes the third party's speech for First Amendment purposes).

Accordingly, H.B. 2023 does not implicate the First Amendment rights of ballot collectors like Knox.

## IV

Finally, we consider Knox's claim that H.B. 2023 violates her right to due process under the Fifth Amendment because it is an overly vague criminal statute.[11]

## A

The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth Amendment. *United States v. Williams*, 553 U.S. 285, 304 (2008). "The Fifth Amendment provides that '[n]o person shall . . . be deprived of life,

---

[11] Knox also argues that we should consider her vagueness challenge under the relaxed standard applicable to criminal statutes that burden protected speech. *See United States v. Williams*, 553 U.S. 285, 304 (2008). Because we have concluded that H.B. 2023 does not burden speech or expressive conduct protected by the First Amendment, we reject this argument.

liberty, or property, without due process of law,'" and "the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law [1] so vague that it fails to give ordinary people fair notice of the conduct it punishes, or [2] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)). A criminal statute violates the "fair notice" requirement if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Colautti v. Franklin*, 439 U.S. 379, 390 (1979) (internal quotation marks omitted). A statute violates the "arbitrary enforcement" requirement if it is "so indefinite that it encourages arbitrary and erratic arrests and convictions." *Id.* (internal quotation marks omitted). In other words, "ordinary notions of fair play and the settled rules of law," *Johnson*, 135 S. Ct. at 2557, are violated if police officers, prosecutors, and judges are essentially "defining crimes and fixing penalties" by filling statutory gaps "so large that doing so becomes essentially legislative." *United States v. Evans*, 333 U.S. 483, 486–87 (1948).

B

H.B. 2023 does not violate either the fair notice or the arbitrary enforcement requirements.

First, H.B. 2023 provides fair notice of the prohibited conduct. It states that "[a] person who knowingly collects voted or unvoted early ballots from another person is guilty of a class 6 felony." Ariz. Rev. Stat. § 16-1005(H). It then exempts from that prohibition "[a]n election official, a United States postal service worker or any other person who is allowed by law to transmit United States mail . . . if the

official, worker or other person is engaged in official duties."
*Id*. A reasonable person would understand that this language
generally prohibits the collection of ballots but makes
exceptions for (1) an election official, if engaged in official
duties, and (2) U.S. postal service workers and other persons
allowed by law to transmit U.S. mail, if engaged in official
duties. Knox points to no evidence that the public has had
difficulties in understanding or complying with H.B. 2023.

Knox's primary argument is that the exception for "any
other person who is allowed by law to transmit United States
mail . . . if . . . engaged in official duties" is unclear. We
disagree. A person of ordinary intelligence would understand
that the language covers persons who have official duties
involving the delivery of United States mail, provided that
they are engaged in such duties at the time they pick up the
ballots (and not volunteering as third-party ballot collectors
during their days off). *See Democratic Nat'l Comm. v.
Reagan*, — F. 3d —, No. 18-15845, 2018 WL 4344291, at *4
(9th Cir. Sept. 12, 2018) (summarizing all exceptions to H.B.
2023); *Knox v. Brnovich*, — F. Supp.3d —, No. CV-18-
02089-PHX-DLR, 2018 WL 4042765, at *8 (D. Ariz. Aug.
27, 2018).

Knox also argues that H.B. 2023 is vague because the
exception for "any other person allowed by law to transmit
United States mail" could be interpreted as exempting
everyone in the country. She reasons that the private hands
exemption to the postal monopoly effectively allows anyone
to deliver United States mail, so long as the delivery is
uncompensated. Such a reading would deprive H.B. 2023 of
any meaningful impact, because it would effectively allow
anyone to collect early ballots. We reject this argument,
because a person of ordinary intelligence would not read H.B.

2023 in a manner that would make its restrictions meaningless. Indeed, Knox herself stated that she understood H.B. 2023 prohibits her from collecting early ballots. Moreover, we have stated that H.B. 2023's restrictions are meaningful. *See Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 368 (9th Cir. 2016) (en banc) (stating that H.B. 2023 made "the collection of legitimate ballots by third parties a felony").

We also reject Knox's argument that a plain reading of the exception makes it duplicative of the separate exception for "a United States postal service worker." Federal law authorizes government officials who are not employees of the Postal Service to deliver U.S. mail as part of their official duties. *See, e.g.*, 39 U.S.C. § 406 (authorizing Department of Defense and Department of Transportation personnel "to perform postal services" at branch post offices at "camps, posts, bases, or stations of the Armed Forces and at defense or other strategic installations"); *see also* 39 U.S.C. § 413 (authorizing Department of State personnel "to perform postal services" at branch post offices at United States diplomatic missions in locations abroad). Under H.B. 2023, such officials would not qualify as postal service workers, but would qualify as "any other person who is allowed by law to transmit United States mail."

We also reject Knox's argument that it is unclear when an individual is "engaged in official duties" when collecting early ballots. Similar phrases are common in the federal criminal code[12] and have been upheld against vagueness

---

[12] *See, e.g.*, 18 U.S.C. § 111 (criminalizing anyone who "assaults, resists, opposes, impedes, intimidates, or interferes with" any federal employee or official while they are "*engaged in or on account of the*

challenges. *See United States v. Linn*, 438 F.2d 456, 458 (10th Cir. 1971); *United States v. Varkonyi*, 645 F.2d 453, 456–57 (5th Cir. 1981).

Finally, Knox claims that she could qualify as an "election official . . . engaged in official duties" because her duties as a precinct committeeperson include the delivery of United States mail. We disagree. No person of ordinary intelligence would conclude that a precinct committeeperson is an election official who is authorized to collect early ballots as part of her official duties. *Compare* Ariz. Rev. Stat. § 16-822(E) (detailing precinct committeeperson duties), *with* 39 U.S.C. § 413 (authorizing State Department personnel "to perform postal services").

Because the scope of H.B. 2023 is clear, it poses no significant threat of arbitrary enforcement. A July 16, 2018, statement issued by the Maricopa County Attorney is not to the contrary.[13] In that statement, the County Attorney stated

---

*performance of official duties . . .*") (emphasis added); *see also* 18 U.S.C. § 115 (criminalizing the assault, kidnap, or murder, or the attempt or threat to do so, of a federal official, judge, or law enforcement officer, or their family member, "with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while *engaged in the performance of official duties*, or with intent to retaliate against such official, judge, or law enforcement officer on account of the *performance of official duties . . .*") (emphasis added).

[13] The Maricopa County Attorney's July 16, 2018 statement reads in full:

> It has come to my attention that there may be some confusion about the intention to enforce the election laws in Arizona. I want to assure anyone who may be planning to engage in ballot harvesting for this Primary

he intended to enforce H.B. 2023 and informed anyone who was planning to engage in "ballot harvesting" that it was a class 6 felony to collect a ballot "unless you are a family member, household member, or caregiver for the voter to whom the ballot was issued." Although, as Knox argues, the County Attorney did not state that H.B. 2023 also exempted postal service workers or other authorized personnel engaged in official duties, Knox does not explain how such an omission poses a risk of "encourag[ing] arbitrary and erratic arrests and convictions," *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972), or raises the spectre of prosecutors "defining crimes and fixing penalties" by filling in gaps in statutes. *United States v. Evans*, 333 U.S. 483, 486 (1948). We conclude that H.B. 2023 is not void for vagueness.

**AFFIRMED**.

---

Election and General Election that it is a class 6 felony to knowingly collect a mail-in ballot for the primary election in August, or for the general election in November, unless you are a family member, household member, or caregiver for the voter to whom the ballot was issued. Based on its concerns about the potential for fraud and misconduct affecting our elections, the Arizona State Legislature passed this law in order to protect the ingerity of Arizona elections. The Maricopa County Attorney's Office is committed to protecting our voting process by enforcing this law. If you are not authorized by the statute to take possession of another voter's ballot, instruct the voter personally to place their [sic] ballot in the mail, to deliver the ballot in person, or to vote in person.