

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00138-CR

_____

CRYSTAL MASON, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court No. 1485710D

_____

Before Kerr, Birdwell, and Bassel, JJ.
Opinion by Justice Birdwell

# OPINION

## I. Introduction

Having waived a jury trial, Appellant Crystal Mason appeals from her conviction by the trial court for illegal voting, a second-degree felony, *see* Tex. Elec. Code Ann. § 64.012(a)(1), (b), and her sentence of five years' confinement. Mason raises the following challenges to her conviction and sentence: (1) the evidence is legally and factually insufficient to support the guilt finding; (2) Texas's illegal-voting statute is preempted by the part of the Help America Vote Act (HAVA) that grants the right to cast a provisional ballot, 52 U.S.C.A. § 21082(a) (West 2015); (3) her conviction resulted from ineffective assistance of counsel; and (4) the illegal-voting statute is unconstitutionally vague as applied to her. We will affirm.

## II. Background

### A. Mason voted in the 2004 and 2008 general elections in Tarrant County, Texas.

In the 2004 general election, Mason filled out an Affidavit of Provisional Voter form promulgated by the Texas Secretary of State, in which she listed her Tarrant County address in Everman, birthdate, social security number, and driver's license number; she also checked a box saying that she is a United States citizen. The affidavit form has two parts: a right side with blanks in which the provisional voter completes the above-described information and a left side that includes affirmations that the voter is "a registered voter of th[e] political subdivision and in the precinct" in which

the person is attempting to vote and that the voter has "not been finally convicted of a felony or if a felon, . . . [has] completed all . . . punishment including any term of incarceration, parole, supervision, [or] period of probation, or . . . [has] been pardoned."[1] Her completion of this form served as an application to register to vote in Tarrant County from that point forward. *See* Tex. Elec. Code Ann. § 65.056(a) ("If the affidavit on the envelope of a rejected provisional ballot contains the information necessary to enable the person to register to vote under Chapter 13, the voter registrar shall make a copy of the affidavit . . . [and] treat the copy as an application for registration . . . ."). Tarrant County accepted the application and registered her as a voter. Mason later voted in the November 2008 general and special elections in Tarrant County as a registered voter, but she had moved by then and had a different Tarrant County address (the Rendon address).

---

[1] The full text on the left side of the affidavit form is in both English and Spanish under the title, TO BE COMPLETED BY VOTER, and reads as follows:

> I am a registered voter in this political subdivision and in the precinct in which I'm attempting to vote and have not already voted in this election (either in person or by mail). I am a resident of this political subdivision, have not been finally convicted of a felony or if a felon, I have completed all of my punishment including any term of incarceration, parole, supervision, period of probation, or I have been pardoned. I have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote. I understand that giving false information under oath is a misdemeanor, and I understand that it is a felony of the 2nd degree to vote in an election for which I know I am not eligible.

**B.**     **Mason pleaded guilty to a federal conspiracy felony, and the federal district court sentenced her to a maximum term of five years' imprisonment followed by a maximum term of three years' supervised release.**

On November 23, 2011, Mason pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C.A. § 371 (tax fraud), a Class D felony. 18 U.S.C.A. §§ 371, 3559(a)(4) (West 2015). A person convicted of this offense is subject to a maximum term of imprisonment of five years and a maximum term of post-imprisonment supervised release of three years. *Id.* §§ 371, 3559(b), 3581(b)(4), 3583(a), (b)(2) (West 2015). On March 19, 2012, a federal district judge found her guilty and sentenced her to the maximum term of both: five years' imprisonment and three years' supervised release "upon release from imprisonment." Mason did not appeal but later filed a postconviction motion to vacate, set aside, or correct the sentence under 28 U.S.C.A. § 2255. *United States v. Mason-Hobbs*, Nos. 4:13-CV-078-A, 04:11-CR-151-A-1, 2013 WL 1339195, at *2 (N.D. Tex. Apr. 3, 2013) (mem. op. and order), *aff'd*, 579 Fed. App'x 248, 248–49 (5th Cir. 2014).[2]

As grounds for the motion, Mason alleged ineffective assistance of trial counsel and sought a reduction in her sentence. But the district court denied the motion,

---

[2]In its order denying relief, the district court described the legal standard for Section 2255 relief: "After conviction and exhaustion, or waiver, of any right to appeal, courts are entitled to presume that a defendant stands fairly and finally convicted. A defendant can challenge her conviction or sentence after it is presumed final on issues of constitutional or jurisdictional magnitude only . . . ." *Mason-Hobbs*, 2013 WL 1339195, at *2 (citations omitted).

making it clear that Mason had avoided a much stiffer sentence[3] only through the "exceptionally good" representation of her trial counsel. *Id.* at *2–6. Thus, there is no question that Mason's federal conviction had become final by at least 2013.

**C.     Upon Mason's federal felony conviction, her local elections authority cancelled her voter registration.**

Upon Mason's conviction, the prosecuting United States Attorney had to give written notice of her conviction to the Texas Secretary of State, the "chief State election official" under Section 20507(g)(1) of the National Voting Rights Act ("NVRA"). 52 U.S.C.A. §§ 20507(g)(1), 20509 (West 2015); *see* Tex. Elec. Code Ann. § 31.001(a) ("The secretary of state is the chief election officer of the state."); *Cascos v. Tarrant Cty. Democratic Party*, 473 S.W.3d 780, 786 (Tex. 2015) ("The secretary of state is the state's chief election officer responsible for ensuring the uniform

---

[3]As the federal trial judge explained while addressing Mason's trial counsel during her sentencing hearing,

> In this case, were it not for the fact that she was charged with only one offense, and obviously she could have been charged with multiple offenses, her Guideline range would have been 87 to 108 months. So you have done an exceptionally good job on behalf of your client . . . for figuring out how to get the Government to charge her with only one offense. And by doing so you have capped her sentence at 60 months.
>
> It would require a sentence of at least 60 months to begin to adequately and appropriately address the factors the Court should consider under 18 United States Code § 3553(a) ["Factors to be considered in imposing a sentence."]. So I plan to impose a sentence of 60 months.

*Id.* at *5–6.

5

application and interpretation of election laws throughout Texas."). The NVRA-mandated notice includes the following information for the convicted person: name, age, residence address, date of entry of the judgment of conviction, description of the offenses of which the individual was convicted, and sentence imposed. 52 U.S.C.A. § 20507(g)(2) (West 2015). Moreover, the NVRA mandates that the Texas Secretary of State provide the same information to the "voter registration officials of the local jurisdiction" in which the convicted person resides. *Id.* § 20507(g)(5).

In accordance with the NVRA's requirements, the Tarrant County Elections Administration ("TCEA") ultimately received an April 26, 2013 report from the Texas Secretary of State, which included 2012 federal felony sentences for Texas residents, including Mason's. In addition to the NVRA-mandated information, the report included the last four digits of Mason's social security number. More particularly, for all federal felony sentences, the report identified the specific United States Attorney's office providing the information and included columns for the date of the sentence, the charges made the basis of the conviction, the months of custody, and the years of supervised release. For Mason, the report confirmed a March 2012[4] conviction pursuant to 18 U.S.C.A. § 371 for "[c]onspiracy to commit offense or to defraud US" with a sentence of sixty months in federal custody and three years of supervised release. Finally, the report listed Mason's home address as the Rendon address.

---

[4]The report mistakenly listed the day of her conviction as March 18, 2012.

6

After receiving the report, the TCEA mailed a Notice of Examination dated May 22, 2013, to Mason at the Rendon address indicating that it was examining her voter registration because it had received information about her felony conviction. The notice also informed Mason that if she did not reply within thirty days providing "adequate information or documentation" establishing her qualifications to remain registered, her registration would be cancelled. *See* Tex. Elec. Code Ann. § 16.033 (providing for cancellation of voter registration following investigation of eligibility).

On June 25, 2013, the TCEA mailed Mason a Notice of Cancellation of Voter Registration to the Rendon address indicating that because Mason had not responded to the Notice of Examination, her voter registration in Tarrant County had been cancelled. *See id.* § 16.031(a)(3) (providing for immediate cancellation of registration on receipt of "an abstract of a final judgment of the voter's . . . conviction of a felony"). The notice further indicated that she was entitled to a hearing on written request and that she could appeal any adverse decision by petitioning for review in a state district court. *See id.* § 16.036.

It is undisputed that the TCEA mailed both notices to the Rendon address while Mason was serving her sixty-month term of imprisonment in federal custody. Mason denied ever having received the notices. But neither were ever returned to the TCEA. Upon cancelling Mason's Tarrant County voter registration, the TCEA changed her registration status to "cancelled" in its computerized voter-registration system and, specific to her registration status, added a reference to the Texas Secretary

7

of State's 2012 report of federal felony sentences in the "Comments" section: "SOS Felon List."

**D.    After completing her sixty-month term of imprisonment and during her supervised-release period, Mason cast a provisional ballot in the November 2016 general election; a grand jury subsequently indicted her for the offense of illegal voting.**

On November 6, 2015, Mason was released from federal custody to a re-entry halfway house. While there, she—in her own words—"had to go through pre-release classes where you have to go back and meet with different people and sign papers and everything before you actually go on probation." She was released from the halfway house on August 5, 2016.[5] That same day, she reported to the federal probation office—as she had been ordered to do in her final judgment of conviction—and met with the officer assigned to supervise her. She reported that her residence would be the Rendon address. According to the lead supervisor in the probation office, no one in the office told Mason that she could not vote while on supervised release because "[t]hat's just not something [they] do."

On November 8, 2016, Mason went to her designated polling place so that she could vote in the general election. She presented a valid driver's license with correct information, but the teen worker checking the voter-registration roll could not find her name after looking under both "Mason" and "Hobbs." Because Mason's name was not on the voter-registration roll even though she was at the correct polling

---

[5]Mason clarified that she lived at the halfway house for three months and was confined to her home for six months.

location based on her driver's license residence—the Rendon address—election workers offered to let her complete a provisional ballot, which she agreed to do. As she had done in 2004, Mason filled out an Affidavit of Provisional Voter and signed it. She was given a code for a provisional ballot, selected her choices on a voting machine, and cast her provisional ballot electronically.

Mason's neighbor Karl Dietrich, the elections judge for the precinct in which Mason resided, called the Tarrant County District Attorney's Office the day after the general election to report a concern that the teen worker had brought to his attention about Mason's provisional ballot.[6] Several months later, a grand jury issued an indictment alleging that Mason had, in the 2016 general election, "vote[d] in an election in which she knew she was not eligible . . . after being finally convicted of the felony of Conspiracy to Defraud the United States . . . , and [she] had not been fully discharged from her sentence for the felony including any court ordered term of parole, supervision and probation."

Mason waived a jury, and after hearing evidence, the trial judge found her guilty and sentenced her to five years' confinement. *See id.* § 64.012(b); Tex. Penal Code Ann. § 12.33(a) (providing the range of incarceration for a second-degree felony as between two to twenty years). Mason filed a motion for new trial, which the trial court denied after an evidentiary hearing. Mason then filed this appeal.

---

[6]He did not elaborate on this concern in the record because the trial court sustained Mason's hearsay objection.

## III. Sufficiency of the Evidence

In her first and second points, Mason challenges the sufficiency of the evidence to support her conviction. Within her complaint, she raises two statutory-construction questions that inform the hypothetical jury charge by which we measure evidence's sufficiency[7]: (1) Does the term "supervision" in Election Code Section 11.002(a)(4)(A), describing who is qualified to vote, include post-imprisonment supervised release imposed as part of a federal sentence? and (2) Does the word "vote" in Section 64.012(a)(1) include casting a provisional ballot? We will address both of these construction questions within the context of her two points. *See, e.g., Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018); *Delay v. State*, 465 S.W.3d 232, 235 (Tex. Crim. App. 2014) ("[S]ometimes appellate review of legal sufficiency involves simply construing the reach of the applicable penal provision in order to decide whether the evidence, even when viewed in the light most favorable to conviction, actually establishes a violation of the law.").

Although we review sufficiency of the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt, *Jackson v. Virginia*, 443 U.S. 316, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App.

---

[7]*See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016) (explaining requisites of hypothetically correct jury charge); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (noting that hypothetical jury charge benchmark against which to perform sufficiency review "can uniformly be applied to all trials, whether to the bench or to the jury").

2017),[8] we review these statutory-construction questions de novo, *Lang*, 561 S.W.3d at 180. Additionally, we must construe criminal statutes outside the penal code strictly, resolving any doubt in the accused's favor. *State v. Rhine*, 297 S.W.3d 301, 309 (Tex. Crim. App. 2009). But in doing so, we may not ignore a statute's plain language. *State v. Johnson*, 219 S.W.3d 386, 388 (Tex. Crim. App. 2007).

## A. Background law and indictment

Only a "qualified voter" may vote in an election in Texas; individuals convicted of felonies or other enumerated crimes forfeit the franchise. Tex. Elec. Code Ann. § 11.001; *see* Tex. Const. art. VI, § 1(a)(3) (prohibiting convicted felons from voting "subject to such exceptions as the Legislature may make"), § 1(b) (directing the Texas Legislature to prohibit persons convicted of "bribery, perjury, forgery, or other high crimes" from voting). A person convicted of a felony is re-enfranchised in one of two ways: (1) if the person has "fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court," Tex. Elec. Code Ann. § 11.002(a)(4)(A), or (2) if the person

---

[8]We use only one standard of review to measure the sufficiency of the State's evidence in criminal cases. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Although Mason raised both legal and factual sufficiency complaints, she acknowledges that we apply only one standard of review to our consideration of the sufficiency of the State's evidence.

has "been pardoned or otherwise released from the resulting disability to vote," *id.* § 11.002(a)(4)(B).[9]

---

[9]Curiously, although in Article VI, Section 1(a)(3) the Texas constitution allows the legislature to enact conditions for the re-enfranchisement of felons generally, Article VI, Section 1(b) immediately following it mandates that the legislature categorically *exclude* persons convicted of "bribery, perjury, forgery, or other high crimes" from re-enfranchisement. Tex. Const. art. VI, § 1(b). Section 1(b) was not originally in Article VI; instead, before voters approved amendments reorganizing the Texas constitution in 2001, Section 1(b) was included in former Article XVI, Section 2 and read, "Laws shall be made to exclude from office, serving on juries, and from the right of suffrage, those who may have been or shall hereafter be convicted of bribery, perjury, forgery, or other high crimes." The reorganizational amendments voters approved in 2001 moved Section 1(b) to its current location but did not substantively change its mandatory language. Thus, it appears that the Texas constitution does not allow the *legislature* to re-enfranchise a person convicted of "bribery, perjury, forgery, or other high crimes." Nevertheless, the statutory definition of "qualified voter" in the Election Code does not appear to even acknowledge the absolute constitutional disenfranchisement for "bribery, perjury, forgery, and other high crimes" convictions. *See also* Tex. Att'y Gen. Op. No. KP-0251 (2019) (discussing eligibility of convicted felons to run for office in Texas after completing their sentences and having their voting rights restored, without discussing Article VI, Section 1(b)'s mandatory exclusion of certain felonies). *But see* Tex. Att'y Gen. Op. No. GA-0141 (2004) (recognizing distinction).

In construing the former version of Article XVI, Section 2, the Texas Court of Criminal Appeals—in *Perez v. State*, which was handed down before the 2001 constitutional amendments—held that the term "high crimes" as used in that section did not mean simply all felony convictions but rather crimes of "moral corruption and dishonesty." 11 S.W.3d 218, 220–22 (Tex. Crim. App. 2000) (observing that the former version of Article XVI, Section 2's absolute exclusion from "office, serving on juries, and from the right of suffrage" for such crimes has appeared as a distinct constitutional prohibition, apart from the more general prohibition as to felony convictions, since 1845); *see also Rice v. State*, 107 S.W. 832, 833 (Tex. Crim. App. 1908) (holding that individual finally convicted and sentenced for perjury was absolutely disqualified from serving on a jury absent gubernatorial pardon); *Easterwood v. State*, 31 S.W. 294, 296–97 (Tex. Crim. App. 1895) (noting that full gubernatorial pardon restores constitutionally disqualified individual "to his right of suffrage, and his competency as a juror"). *But see* Tex. Const. art. VI, § 1 cmt. ("[T]he constitution of

"A person commits an offense if the person . . . votes or attempts to vote in an election in which the person knows the person is not eligible to vote." *Id.* § 64.012(a)(1). Texas law has long provided that to prove the commission of this offense, the State need only show beyond a reasonable doubt that the defendant voted while knowing of the condition that made the defendant ineligible;[10] the State does not have to prove that the defendant subjectively knew that voting with that

the Republic stipulated that laws were to be passed excluding from the right of suffrage those who in the future were convicted of bribery, perjury, or other high crimes and misdemeanors . . . . This stipulation was carried over into the Constitution of 1845 with some slight changes, the list of crimes reading: bribery, perjury, forgery, or other high crimes . . . . The same crimes appear in all subsequent constitutions until the present one *in which it was limited solely to felonies*." (emphasis added)).

In *In re Birdwell*, also issued before the 2001 constitutional amendments, the Supreme Court of Texas held that a federal conviction for conspiracy to defraud the United States in violation of 18 U.S.C.A. § 371 is a crime of moral turpitude that mandates disbarment under the Texas Rules of Disciplinary Procedure, involving, as it does, conduct that is deceitful or dishonest. 20 S.W.3d 685, 686–88 (Tex. 2000). Since Birdwell's—and Mason's—indictments and guilty pleas both involved allegations of tax fraud against the United States by frustrating the Internal Revenue Service's lawful, federal-income-tax-related functions, it appears that the Texas Supreme Court—at least for purposes of the civil law—would consider Mason's federal conviction to be for a "high crime," thus raising the question of whether the *legislature* could ever re-enfranchise her via Section 11.002(a)(4)(A) without running afoul of Article VI, Section 1(b).

[10]*See* Tex. Penal Code Ann. § 6.03(b) (providing that a person acts with knowledge of the circumstances surrounding his conduct when he is aware that the circumstances exist); *cf. Goss v. State*, 582 S.W.2d 782, 783–85 (Tex. Crim. App. 1979) (holding that for duty to stop and render aid to arise—for purposes of prosecution for failure to stop and render aid under former version of statute—defendant must have known of the circumstances present when he failed to stop, that is, he must have known that an accident had occurred; therefore, the mens rea for the offense was knowing) (cited by *Curry v. State*, No. PD-0577-18, 2019 WL 5587330, at *4–5 (Tex. Crim. App. Oct. 30, 2019)).

condition made the defendant ineligible to vote under the law or that to vote while

having that ineligibility is a crime. *See, e.g.*, *Thompson v. State*, 9 S.W. 486, 486–87 (Tex.

Ct. App. 1888);[11] *Jenkins v. State*, 468 S.W.3d 656, 672–73 (Tex. App.—Houston [14th

Dist.] 2015), *pet. dism'd, improvidently granted*, 520 S.W.3d 616 (Tex. Crim. App. 2017)

(per curiam); *Medrano v. State*, 421 S.W.3d 869, 884–85 (Tex. App.—Dallas 2014, pet.

ref'd);[12] *see also* Tex. Penal Code Ann. § 8.03(a) ("It is no defense to prosecution that

---

[11]As the highest court with criminal jurisdiction before the creation of the Texas Court of Criminal Appeals, the Texas Court of Appeals's opinions are precedential and binding on this court. *See* Hon. James T. "Jim" Worthen, *The Organizational & Structural Development of Intermediate Appellate Courts in Texas, 1892–2003*, 46 S. Tex. L. Rev. 33, 34–35 (2004) (explaining that Court of Appeals, predecessor to Court of Criminal Appeals, was added to the judiciary by the 1876 constitution as an addition to the Texas Supreme Court, not as an intermediate court, but as a court with jurisdiction to hear all criminal appeals from trial courts); Robert W. Higgason, *A History of Texas Appellate Courts: Preserving Rights of Appeal Through Adaptations to Growth, Part 1 of 2: Courts of Last Resort*, 39 Hous. Law. 20, 24 (2002); *see also* Dylan O. Drummond, *Citation Writ Large*, 20 App. Advoc. 89, 96 (2007) (explaining that opinions of the Texas Court of Appeals between April 18, 1876, and August 13, 1892, must be accorded the precedential value of the highest court of the state for criminal matters).

[12]Neither Mason nor the State cites *Thompson*, *Medrano*, *Jenkins*, or related on-point authority, which rendered much of the trial testimony superfluous. The authority Mason relies on to argue that the State had to prove her subjective knowledge that she was committing a crime is inapposite and does not relieve us of the duty to follow on-point authority from the higher court. *See State ex rel. Vance v. Clawson*, 465 S.W.2d 164, 168 (Tex. Crim. App. 1971); *Wiley v. State*, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref'd).

For example, Mason relies on the Court of Criminal Appeals's analysis in *Delay* to argue that the State had to prove that she knew being on supervised release made her legally ineligible to vote. But the different statutes at issue in *Delay* were ambiguous; thus, the court of criminal appeals had to engage in a different analysis to determine the correct mens rea that the State would have to prove for each of them.

the actor was ignorant of the provisions of any law after the law has taken effect."); *Crain v. State*, 153 S.W. 155, 156 (Tex. Crim. App. 1913) (rejecting argument that defendant was entitled to instruction that he could not have been illegally possessing pistol if he was carrying the cylinder in one pocket but the rest in his other pocket, explaining, "If appellant only did the acts he intended to do, believing that same was no violation of law, yet, if in fact such acts were prohibited by law, he would be punishable, for all persons are presumed to know what the law prohibits one from doing."); *Heath v. State*, No. 14-14-00532-CR, 2016 WL 2743192, at *6 (Tex. App.— Houston [14th Dist.] May 10, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *Medrano*).

When the Texas Court of Appeals decided *Thompson* in 1888, the illegal-voting statute was substantially the same as today's Section 64.012(a)(1): "If any person knowing himself not to be a qualified voter, shall, at any election, vote, or offer to

---

465 S.W.3d at 246–47, 249–51 (construing ambiguous money-laundering statute to require proof of knowledge of criminal nature of facilitated transaction and construing Election Code provision prohibiting certain donations by corporations to require, "as written, . . . that the actor be aware, not just of the particular circumstances that render his otherwise-innocuous conduct unlawful, but also of the fact that undertaking the conduct under those circumstances in fact" violates the Election Code). The statutes in *Delay* were ambiguous because they placed the "knowingly" descriptor before both the verb describing the actus reas and the following clause describing the actus reas; Section 64.012(a)(1) places the word "knows" after the actus-reas verb and immediately before the word describing the attendant circumstances—"ineligible." Thus, what "knows" was intended to describe in Section 64.012(a)(1) is not ambiguous, as was the word placement in the statutes at issue in *Delay. See* Tex. Gov't Code Ann. § 311.011(a) (providing that courts must read words and phrases according to grammar and common usage rules).

vote, for any officer to be then chosen, he shall be punished by confinement in the penitentiary not less than two nor more than five years." *See Medrano*, 421 S.W.3d at 884–85 & n.5 (noting also that the 1879 Penal Code may be accessed on the Texas State Law Library website). In *Thompson*, the Texas Court of Appeals held that the following instruction in an illegal-voting case was proper: "If the defendant had been convicted of an assault with the intent to murder, as alleged in the indictment in this cause, and if he knew at the time he so voted that he had been so convicted, such knowledge of his conviction would be equivalent in law to knowing himself not to be a qualified voter."[13] 9 S.W. at 486–87. Citing the principle that a person is presumed to know both the civil and criminal law, the court held that the State did not have to prove that Thompson knew that voting after being finally convicted of a felony was illegal. *Id.* The court concluded,

> [I]f we were to hold the law to be that the state must prove that the defendant knew that the offense of which he had been convicted was a felony, *and that such conviction disqualified him to vote*, the effect would be that a conviction for illegal voting by persons convicted of felony could rarely be obtained, because it would be an exceptional case in which such proof could be made.

*Id.* at 487 (emphasis added).

In more recent years, the Dallas Court of Appeals followed *Thompson* in *Medrano*—an illegal-voting case under Section 64.012(a)(1) in which the defendant's residence was not in the precinct in which she voted—explaining that "the State did

---

[13]At the time, the Texas constitution did not authorize the legislature to re-enfranchise persons convicted of any type of felony. *See infra* n.16.

16

not need to prove [Medrano] subjectively knew she was not eligible to vote; it needed only to prove she voted in the March 2010 Dallas County Primary Election when she knew she was not a resident of the precinct for which she was voting." 421 S.W.3d at 885. The Houston Fourteenth Court of Appeals likewise relied upon this statement of law in *Jenkins*, 468 S.W.3d at 672–73, and *Heath*, 2016 WL 2743192, at *1–2, *6, illegal-voting prosecutions under Section 64.012(a)(1) arising from the same election. Thus, contrary to Mason's assertion, the fact that she did not know she was legally ineligible to vote was irrelevant to her prosecution under Section 64.012(a)(1); instead, the State needed only to prove that she voted while knowing of the existence of the condition that made her ineligible, in this case—as alleged by the State—that she was on federal supervised release after being released from imprisonment after a final felony conviction.

An illegal-voting defendant's subjective belief about the law becomes relevant only if the evidence raises either (1) the affirmative defense of mistake of law, in which the issue is not whether the defendant simply did not know the conduct was a crime but that, because of reasonable reliance on an official statement or interpretation of the law by a statutorily prescribed source, the defendant affirmatively believed that the conduct was not criminal, *see Jenkins*, 468 S.W.3d at 671–80 (discussing whether mistake-of-law affirmative defense raised by evidence); *see also* Tex. Penal Code Ann. § 8.03(b) (describing mistake-of-law affirmative defense); or (2) the defense of mistake of fact, in which a factual mistake negates the offense's

17

mens rea, *see* Tex. Penal Code Ann. § 8.02; *cf. Curry*, 2019 WL 5587330, at *7 (explaining that mistake-of-fact defense was raised in failure-to-stop-and-render-aid prosecution when some evidence showed that defendant knew he was involved in an accident but mistakenly believed that he had collided with road debris or a beer bottle, not a person). But some evidence must raise these issues before a factfinder is required to consider them. *See Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008).

Based on the foregoing, if casting a provisional ballot constitutes the act of voting under Election Code Section 64.012(a)(1) and if being on post-imprisonment supervised release for a federal offense constitutes being on supervision under Election Code Section 11.002(a)(4)(A), the State here needed to prove only that Mason voted while knowing she had been finally convicted of a felony and had not yet completed her supervised release. *See Medrano*, 421 S.W.3d at 881–85. Mason does not argue that the evidence failed to show that she knew she was still on supervised release after her final federal conviction when she cast her provisional ballot. Instead, she challenges whether Section 11.002(a)(4)(A) and Section 64.012(a)(1) apply to her circumstances.

## B. "Supervision" in Section 11.002(a)(4)(A) includes post-imprisonment supervised release imposed as part of a federal sentence.

As part of her first and second points, Mason argues that a person who has been convicted by a federal court and thereafter released from confinement to

18

"supervised release" has "fully discharged" his or her federal sentence under Section 11.002(a)(4)(A) because the Texas Legislature meant for the term "supervision" to apply only to "community supervision" imposed under state law.

The Texas Code of Criminal Procedure defines a sentence as "that part of the judgment . . . that orders that *the punishment* be carried into execution in the manner prescribed by law." Tex. Code Crim. Proc. Ann. art. 42.02 (emphasis added). The plain language of this statute "indicates that a sentence is nothing more than the portion of the judgment setting out the terms of punishment." *State v. Ross*, 953 S.W.2d 748, 750 (Tex. Crim. App. 1997). A legal sentence may include a term of years, a fine, "the fact of shock or regular probation" (community supervision), and sentencing enhancements but not (to name but a few) restitution, probation terms, or court costs. *See Burg v. State*, No. PD-0527-18, 2020 WL 467589, at *5 (Tex. Crim. App. Jan. 29, 2020).

Under federal law, supervised release similarly is part of a convicted person's sentence: "The court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may include *as a part of the sentence* a requirement that the defendant be placed on a term of supervised release after imprisonment." 18 U.S.C.A. § 3583(a) (emphasis added); *see United States v. Pettus*, 303 F.3d 480, 482 (2d Cir. 2002) ("[S]upervised release is part of the whole matrix of punishment arising out of the original offense . . . ."); *cf. United States v. Saleem*, Nos. 1:07cr252 (LMB), 1:10cv893 (LMB), 2010 WL 4791654, at *2 (E.D. Va. Nov. 15, 2010) (mem. op.) (rejecting

19

argument that sentence for conviction of conspiracy to defraud the United States does not and cannot include a term of supervised release). Thus, under federal law, Mason had to successfully serve her entire period of post-imprisonment supervised release as part of her punishment.

The term "supervision" as used in Section 11.002(a)(4)(A) is not defined in the Election Code. Supervision is likewise not defined in the Code of Criminal Procedure, but "community supervision" is defined, solely for the purposes of Chapter 42A, as

> the placement of a defendant by a court under a continuum of programs and sanctions, with conditions imposed by the court for a specified period during which:
>
> (A) criminal proceedings are deferred without an adjudication of guilt; or
>
> (B) a sentence of imprisonment or confinement, imprisonment and fine, or confinement and fine, is probated and the imposition of sentence is suspended in whole or in part.

Tex. Code Crim. Proc. Ann. art. 42A.001(1). For purposes of describing Chapter 42A status, "community supervision" and "probation" are synonymous and generally used interchangeably. *Hongpathoum v. State*, 578 S.W.3d 213, 214 n.1 (Tex. App.—Fort Worth 2019, no pet.); *see* Tex. Const. art. IV, § 11A (authorizing the suspension of imposition or execution of sentence after conviction and placement of the defendant on "probation").

Black's Law Dictionary defines supervision as "[t]he series of acts involved in managing, directing, or overseeing persons or projects."[14] *Supervision*, Black's Law Dictionary (11th ed. 2019). It defines probation as "[a] court-imposed criminal sentence that, subject to stated conditions, releases a convicted person into the community instead of sending the criminal to jail or prison, usu. on condition of routinely checking in with a probation officer over a specified period of time." *Probation, id.* Black's further defines parole as "[t]he conditional release of a prisoner from imprisonment before the full sentence has been served" and notes that "parole is usu. granted for good behavior on the condition that the parolee regularly report to a supervising officer for a specified period." *Parole, id.*

Applying normal grammar rules and construction aids to Section 11.002(a)(4)(A)'s phrase, "has not been finally convicted of a felony or, if so convicted, has . . . fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court," we glean two important meanings. First, this subsection contemplates that under Texas law the punishment for a criminal conviction—a sentence—can consist

---

[14] *See* Tex. Elec. Code Ann. § 1.003(a) (providing that Code Construction Act applies to Election Code except where expressly stated otherwise); Tex. Gov't Code Ann. § 311.011 (providing that, in addition to reading words and phrases according to grammar and common usage rules, courts must also read them according to any technical or particular meanings that they have acquired or been assigned); *Ex parte White*, 400 S.W.3d 92, 93 (Tex. Crim. App. 2013) (reciting that court construes words in a statute according to their plain meanings unless those constructions would lead to absurd results that the legislature could not have possibly intended).

21

of one or a combination of consequences. By introducing the words "incarceration," "parole," and "supervision"—and the phrase "completed a period of probation"—with the word "including," the legislature indicated that those things are not an exhaustive list of what can be included in a sentence. *See* Tex. Gov't Code Ann. art. 311.005(13) ("'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded."). The plain wording of the statute indicates that whatever modes of punishment—one or more—make up a sentence, they must all be completed for the person to regain eligibility to vote after a felony conviction.

Second, in Section 11.002(a)(4)(A), supervision and probation are listed separately from each other as well as from parole and incarceration. Thus, the legislature could not have intended supervision and probation to mean the same thing. *See Campbell v. State*, 49 S.W.3d 874, 876 (Tex. Crim. App. 2001) ("In analyzing the language of a statute, we assume that every word has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible."); *cf. United States v. Reyes*, 283 F.3d 446, 458 (2d Cir. 2002) (explaining that federal supervised release differs from parole because it does not replace a term of imprisonment but is imposed in addition to imprisonment). Nor did the legislature attempt to narrow the meaning of probation or supervision to only those instances in which Texas state courts impose them. Thus, we conclude that the plain meaning of supervision as used in Section 11.002(a)(4)(A) does not mean only Chapter 42A

22

community supervision and includes post-imprisonment supervised release ordered under 18 U.S.C.A. § 3583(a).[15]

The evidence showed that during Mason's post-imprisonment supervised release, she had to report to a probation officer immediately upon her discharge from federal custody, refrain from committing any other crimes during her period of supervised release, and be subject to taking random drug tests. During that time, she was subject to the oversight of—supervised by—the United States probation office for the Northern District of Texas. Thus, Mason's term of supervised release under 18 U.S.C.A. § 3583(a) was part of her sentence to be served and was included within the plain meaning of the word supervision in Section 11.002(a)(4)(A).[16]

---

[15]Because we conclude that the term supervision, as used in Section 11.002(a)(4)(A), is unambiguous, we need not apply the rule of lenity as urged by Mason. *See* Tex. Gov't Code Ann. § 311.035 (providing that a court must construe in the actor's favor a statute or rule not included in the Penal Code or Health and Safety Code "that creates or defines a criminal offense or penalty" if "any part of the statute or rule is ambiguous on its face or as applied to the case"); *Johnson*, 219 S.W.3d at 388.

[16]Although we need not consider the legislative intent of Section 11.002(a)(4)(A), *see Lang*, 561 S.W.3d at 180, we note that it nevertheless supports our plain-language conclusion. Historically, absent a pardon, convicted felons were not authorized to vote in Texas after their convictions became final. *See* Act approved Aug. 23, 1876, 15th Leg., R.S., ch. 166, § 13, 1876 Tex. Gen. Laws 306, 307, *reprinted in* 8 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 307 (Austin, Gammel Book Co. 1898); *see also* Tex. Const. art. VI, § 1, cmt. In *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978), the Fifth Circuit described the constitutional and statutory framework for the disenfranchisement and re-enfranchisement of convicted felons in the following manner:

> (1) any person convicted of a felony in any court, state or federal, is automatically disenfranchised; (2) a person convicted of a felony in

23

Texas state court and placed on probation may have his conviction set aside and be reenfranchised by the court in which he was convicted, or he may be reenfranchised by gubernatorial pardon; (3) a person convicted of a felony in federal court may be restored to suffrage only by presidential pardon.

*Id.* at 1112 (citing *Hayes v. Williams*, 341 F. Supp. 182, 188 (S.D. Tex. 1972), for the proposition that the former Election Code re-enfranchisement provision applied to persons convicted of federal as well as state felonies ("The Court must also reject the contention that the disability applied to convicted felons in the Texas Constitution and in the Texas Election Code disqualifies only those persons convicted in a State court.")).

By 1985, when the legislature codified the Election Code, an unpardoned felon could regain eligibility to vote if the person "received a certificate of discharge by the Board of Pardons and Paroles or completed a period of probation ordered by a court and at least two calendar years ha[d] elapsed from the date of the receipt or completion." Act of May 13, 1985, 69th Leg., ch. 211, § 1, 1985 Tex. Gen. Laws 802, 811. *But cf. R.R.E. v. Glenn*, 884 S.W.2d 189, 193 (Tex. App.—Fort Worth 1994, writ denied) (op. on reh'g) (noting, in determining whether juror convicted of a felony was disqualified from jury after having successfully completed and been discharged from probation, that "[n]othing in the Constitution contemplates the full restoration of the rights of felons other than by executive pardon"). In 1997, the legislature amended Section 11.002(a)(4)(A) to the current version. *See* Act of May 26, 1997, 75th Leg., R.S., ch. 850, § 1, 1997 Tex. Gen. Laws 2721, 2721 (HB 1001).

The House Committee Report Bill Analysis for HB 1001—containing Section 11.002—notes that the purpose of the amendment was "[t]o eliminate the confusion as to when an ex-felon regains the right to vote," which had arisen because "discharge papers are issued upon release from a TDCJ facility, however, a person may continue on parole for some period." H. Elections Comm., Bill Analysis, Tex. H.B. 1001, 75th Leg., R.S. (1997). The House Research Organization Analysis notes that supporters of the amendment urged that "[b]ecause individuals can be in varying stages of the criminal justice system, there is often uncertainty about when the two year waiting period begins. Individuals, criminal justice professionals, and election personnel themselves have been uncertain about when people become eligible to vote." H. Research Org., Bill Analysis, Tex. H.B. 1001, 75th Leg., R.S. (1997). Thus, the legislative history does not reveal an intent to exempt persons convicted of federal crimes from serving all of their sentences before regaining eligibility. Instead, the intent was to eliminate confusion about when a convicted person could regain the

## C. To cast a provisional ballot is to "vote" under Election Code Section 64.012(a)(1).

Mason next contends that a person does not "vote" under Section 64.012(a)(1) by casting a provisional ballot.[17] According to Mason, provisional ballots are not votes because they may or may not count: "They are conditioned on the eligibility of the voter." Thus, Mason argues that because her provisional ballot was rejected, she did not "vote" under Section 64.012(a)(1). Pertinent to this point, she argues as part of her fourth point that HAVA requires states to allow individuals who believe they are eligible to vote to cast a provisional ballot, without fear of criminal prosecution if they are actually ineligible to vote.[18]

### 1. Plain meaning of the verb "vote"

Like the term "supervision" in Section 11.002(a)(4)(A), the verb "vote" is not

---

right to vote by requiring that person to have first successfully finished every part of that person's sentence for the particular offense for which she was convicted. By eliminating the need for a document that only a Texas institution issued—a certificate of discharge from the Texas Board of Pardons and Paroles—the legislature further signaled an intent that the reinstatement of voting eligibility not be limited to convicted felons discharged from only a state facility.

[17]Counsel argued at the new-trial hearing, "I think the common meaning of voting is where you actually affect the election by your choice on a ballot," and "no amount of evidence proving that [Mason] cast a provisional ballot while on supervised release will ever be sufficient to uphold the conviction of illegal voting."

[18]Because HAVA informs our construction of the verb "vote" in the Texas Election Code, we consider it in the context of the Section 64.012 statutory-construction argument in Mason's first two points.

defined in the Election Code.[19] But it is defined in the Penal Code when proscribing the bribery or coercion of a voter: Penal Code Section 36.01(4) defines the verb "vote" as meaning "to cast a ballot in an election regulated by law." Tex. Penal Code Ann. § 36.01(4). This definition is consistent with the common understanding of the verb.

Black's Law Dictionary defines the verb "vote" as "[t]he act of voting" and voting as "[t]he casting of votes for the purpose of deciding an issue." *Vote*, *Voting*, Black's Law Dictionary. It defines "cast" as "[t]o formally deposit (a ballot) or signal one's choice (in a vote)." *Cast*, *id.* To cast a ballot, then, is to express one's choice, i.e., to vote. Similarly, Webster's Third New International Dictionary defines the verb "vote" as "to express one's views in response to a poll," "to express an opinion," or "to choose or endorse by vote." Webster's Third New Int'l Dictionary 2565 (2002). By comparison, Black's defines the noun "vote" as "[t]he expression of one's preference or opinion in a meeting or election by ballot, show of hands, or other type of communication." *Vote*, Black's Law Dictionary.

Pertinent to a different issue, an intermediate court of appeals has noted that "[c]ommon definitions of the verb 'vote' are '[to] express one's preference for; endorse by a vote,' 'to declare or pronounce by general consent,' . . . 'to enact, elect,

---

[19] Solely for purposes of Title 14 of the Election Code, Section 221.003 defines an "illegal vote"—a noun—as "a vote that is not legally countable." Tex. Elec. Code Ann. § 221.003.

establish, or determine by vote,' or 'to declare or decide by general consent.'" *Nash v. Civil Serv. Comm'n, Palestine*, 864 S.W.2d 163, 165 (Tex. App.—Tyler 1993, no writ) (quoting 1970s and 1980s versions of American Heritage and Random House dictionaries); *see also Wooley v. Sterrett*, 387 S.W.2d 734, 740 (Tex. App.—Dallas 1965, no writ) ("Reason and common sense dictate that the verb 'vote' carries with it the implication of *affirmative choice by action*.").

None of these definitions conditions the definition of the verb "vote" on whether the choice expressed is thereafter counted as part of the poll results. Thus, to cast or deposit a ballot[20]—to vote—can be broadly defined as expressing one's choice, regardless of whether the vote actually is counted.

## 2. HAVA

Several federal statutes address voting and voting rights, including HAVA. Congress had several purposes behind HAVA, which it implemented after the 2000 election.[21] *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1076 (N.D. Fla. 2004). One purpose was to alleviate problems with voters arriving at polling places believing they are eligible to vote but not being allowed to vote because the election workers

---

[20]As we explain below, the Election Code's provisional-ballot provisions speak in terms of "casting" such a ballot.

[21]HAVA is Congress's attempt to "strike a balance between promoting voter access to ballots on the one hand and preventing voter impersonation fraud on the other." *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008).

could not find their names on the list of qualified voters.[22] *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004). "HAVA dealt with this problem by creating a system for provisional balloting, that is, a system under which a ballot would be submitted on election day but counted if and only if the person was later determined to have been entitled to vote." *Id.* HAVA also required that states wishing to receive federal funding for updating and improving voting systems implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." 52 U.S.C.A. § 21083(a)(1)(A) (West 2015).

---

[22]As one federal court has articulated,

> Provisional ballots are available because election workers do not have perfect knowledge on election day; they may not know whether a person ultimately will or will not be determined to have been eligible. Affording a potential voter a reliable—and enforceable—means of asserting his or her right to vote on election day, even if election workers assert the voter is ineligible, serves at least three important purposes. First, it tells election workers that their decisions are subject to check. . . . Second, allowing provisional balloting provides some assurance that eligibility determinations have been made correctly. Rather than a hurried decision by a volunteer amid the chaos of a busy election day, the result is a decision by appropriate officials at a more leisurely pace with greater transparency. And third, even if the actual decision with respect to any ballot is not changed and the number of votes counted for each candidate ultimately remains the same, allowing provisional balloting improves the *perception* that the election has been conducted fairly.

*Fla. Democratic Party v. Hood*, No. 4:04 CV 395 RH/WCS, 2005 WL 2137016, at *4 (N.D. Fla. Sept. 1, 2005).

28

By adopting the provisional-voting section of HAVA, Congress sought to protect the right to vote when voters "appear at the proper polling place *and are otherwise eligible to vote.*" *See Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1292–93 (N.D. Ga. 2018) (emphasis added) (citing *Hood*, 342 F. Supp. 2d at 1078–79). The person who claims eligibility to vote, but whose eligibility to vote at that time and place cannot be verified, is entitled under HAVA to cast a provisional ballot, as well as to have that vote counted if the person is duly registered and eligible. *See* 52 U.S.C.A. § 21082(a)(2), (4) ("If the appropriate State or local election official to whom the ballot or voter information is transmitted under paragraph (3) determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law."). Thus, HAVA requires that before exercising the right to cast a provisional ballot, a person must affirm that she is registered and eligible to vote.[23] *Id.* § 21082(a)(2). This is the *only* permissible requirement that may be imposed upon a would-be voter before permitting that voter to cast a provisional ballot. *Sandusky*, 387 F.3d at 574. Although

---

[23]A person who intentionally or knowingly provides false information in connection with voting is subject to criminal liability under both federal and Texas law. *See* 52 U.S.C.A. § 20511(2) (West 2015) (fine and up to five years' imprisonment); Tex. Elec. Code Ann. § 13.007 (class B misdemeanor to knowingly making false statement on registration application), § 276.013(a)–(b) (Class A misdemeanor to knowingly or intentionally make any effort to "cause . . . a ballot to be obtained, or a vote to be cast under false pretenses" or to knowingly or intentionally make any effort to "cause any intentionally misleading statement, representation, or information to be provided . . . to an election official[] or . . . on . . . any other official election-related form or document").

"HAVA is quintessentially about being able to *cast* a provisional ballot," whether a provisional ballot will be counted—i.e., whether the person is a qualified, eligible voter—is a determination left to the states. *Id.* at 576–77.

Thus, HAVA's provisional-ballot procedure and centralized-voter-registration-list requirement are intended to prohibit election workers and officials from preventing an otherwise qualified and eligible voter from voting. But in doing so, it presumes and does not diminish individual voters' responsibility to determine if they are properly registered and eligible to vote under state law, as evidenced by its affirmation requirement.

### 3. Texas Election Code's implementation of HAVA's provisional-ballot requirement

In 2003, the Texas Legislature amended the Election Code "to implement" HAVA. S. Research Ctr., Bill Analysis, Tex. H.B. 1549, 78th Leg., R.S. (2003); H. Elections Comm., Bill Analysis, Tex. H.B. 1549, 78th Leg., R.S. (2003). Among other things, the legislature

• mandated that the Secretary of State implement and maintain a statewide computerized voter-registration list "that serves as the single system for storing and managing the official list of registered voters in the state" and required the Secretary of State to include certain information in that list;

• required the Secretary of State to adopt rules for an administrative-complaint procedure for certain types of voting-related grievances;

30

• provided a procedure for persons to cast provisional ballots and required election authorities responsible for preparing the official ballots to also prepare provisional ballots "for use by . . . voter[s] who execute[] a[ statutorily required] affidavit";

• amended the types of identification acceptable for voting;

• amended the provision making it an offense for an election official to knowingly permit an ineligible voter to vote "without having been challenged" to exclude criminal liability when the official allows a voter to cast a provisional ballot in accordance with the prescribed procedure;

• set forth procedures for handling, delivering, accepting, and disposing of provisional ballots and for the preservation of records on provisional ballots;

• required voter registrars to treat rejected provisional ballots containing the information necessary to enable a person to register to vote as registration applications for future elections;

• required the Secretary of State to implement a system by which a provisional voter could obtain free information about that vote's disposition; and

• designated the Secretary of State as the state office to provide information regarding voter-registration procedures.

Act of May 28, 2003, 78th Leg., R.S., ch. 1315, 2003 Tex. Gen. Laws 4819, 4821–31. Importantly, the legislature did not amend Section 64.012(a)(1) or Section 11.002(a)(4)(A).

The Election Code procedures for "accepting voter[s]" for voting specifically address provisional ballots. When "offering to vote" at a polling place, a voter must present statutorily described photo identification or, upon sworn affidavit subject to penalty of perjury, substitute identification.[24] Tex. Elec. Code Ann. §§ 63.001(b), (i), 63.011(a), (b). If the voter does so, is on the list of registered voters for the precinct, and the voter's identity can be verified from the identification, the voter must be accepted for voting. *Id.* § 63.001(d). A voter who presents the required identification, like Mason, but who is not on the list of registered voters for the precinct and cannot produce a voter-registration certificate, must "be accepted for provisional voting" if the voter executes a Section 63.011 affidavit. *Id.* §§ 63.009, 63.011 (providing that a person "may *cast* a provisional ballot if the person executes an affidavit stating that the person . . . is a registered voter in the precinct in which the person seeks to vote; and . . . is eligible to vote in the election" (emphasis added)). Thus Texas law, in implementing HAVA, provides a person the statutory right to cast a provisional ballot with proper identification (or the proper affidavits and follow-up procedures in lieu of identification) and the required affirmation of registration and eligibility, regardless of whether the election official knows with certainty that the person is ineligible to vote.

---

[24]The voter may also vote provisionally without identification but with the duty to present statutorily acceptable identification to the voter registrar, or sign a statutorily prescribed affidavit in the voter registrar's presence, within six days of the election. Tex. Elec. Code Ann. §§ 63.001(g), 65.054(b)(2)(B), (C), 65.0541.

The Election Code further explains what happens after a voter is accepted for voting: "[T]he voter shall select a [provisional] ballot, go to a voting station, and prepare the ballot." *Id.* § 64.001. The Election Code's instructions for marking ballots do not distinguish between regular and provisional ballots. *Id.* §§ 64.003–.006. While a nonprovisional voter must deposit a ballot "in the ballot box used for the deposit of marked ballots," *id.* § 64.008(a), a provisional voter must enclose the voter's "marked" ballot "in the envelope on which the voter's executed affidavit is printed," "seal the envelope," and deposit it in a box dedicated to provisional ballots, *id.* § 64.008(b). Further, "[a]t the time a person *casts* a provisional ballot under Subsection (b), an election officer shall give the person written information describing how the person may use the free access system established under Section 65.059 to obtain information on the disposition of the person's vote." *Id.* § 64.008(c) (emphasis added), § 65.059.

Thus, after a voter who is not on the poll list affirms that he or she is registered and eligible, the Election Code procedures speak in terms of that person's casting a provisional ballot, which, as we have explained, is synonymous with "to vote" a provisional ballot.

### 4. Texas's legislative scheme implementing HAVA does not indicate that the verb "vote" in the illegal-voting statute excludes casting a provisional ballot.

Both HAVA and the Texas Election Code contemplate that a provisional voter will, once accepted for voting, mark a ballot, that is, indicate that voter's choices on the provisional ballot. Nothing in Texas's statutory scheme (which specifically

33

implements HAVA) indicates that a person who otherwise meets the requirements for provisional voting, fills out and signs an Affidavit of Provisional Voter, is given a provisional ballot, marks that ballot with the person's choices for each particular office, and deposits that ballot into the provisional voting box does not "vote" as contemplated by Section 64.012(a)(1), the statute under which Mason was convicted.

Mason argues that the provisional-balloting provisions in Texas shift the obligation of knowing an individual voter's legal eligibility to vote away from the voter to the election officials who after the election must review the provisional ballots for voter eligibility to determine whether those votes will be counted: "We should know who's qualified and who is not qualified to vote. And the way that we find out, or at least the way that we're supposed to find out[,] is the provisional ballot." But by allowing a person to be criminally prosecuted for voting illegally when that person does not subjectively know that doing so violates the law, the Texas Legislature has long placed the primary burden for knowing whether an individual voter is legally entitled to vote on that individual, as well as (originally) on election officials at the polling place.[25] When Texas ultimately amended the Election Code to implement

---

[25]Under the current Election Code, an election officer commits an offense by knowingly permitting an ineligible voter to vote "other than as provided by Section 63.011," the provisional-ballot authorization. *Id.* § 63.012(a)(1). Before the 2003 amendments to the Election Code, the prior version of Section 63.012 made it an offense for an election official to knowingly permit an ineligible voter to vote "without having been challenged." Act of May 13, 1985, 69th Leg., R.S., ch. 211, § 1, 1985 Tex. Gen. Laws 802, 880.

HAVA—enacted with a purpose of preventing election officials from turning away voters at polling places based on those election officials' subjective beliefs—it took away the burden and responsibility of confirming a potential voter's legal eligibility from the election officials at the polling place. But nothing in the 2003 amendments to the Election Code or the current version of the Election Code regarding provisional voting evidences a legislative intent to shift the primary burden (and risk) of confirming legal eligibility away from the individual voter to the election officials later charged with reviewing provisional ballots to confirm that voter's eligibility. Therefore, whether this primary burden should in the future remain with the individual voter under Section 64.012(a)(1) is a question for the Texas Legislature.

We hold that the word "vote" in Section 64.012(a)(1) includes in its plain meaning the act of casting a provisional ballot. Having determined under a de novo review that the plain language of Section 11.002(a)(4)(A) and Section 64.012 applies to Mason's situation,[26] we now apply the *Jackson* standard to the evidence.

## D. Mason's conviction supported by sufficient evidence

Here, the indictment alleged that Mason

[d]id . . . vote in an election in which she knew she was not eligible to vote . . . , to-wit: the 2016 General Election, after being finally convicted of the felony of Conspiracy to Defraud the United States, in the United States District Court of the Northern District of Texas, Fort Worth Division, on March 16, 2012, in case number 4:11-CR-151-A(Ol), and Defendant had not been fully discharged from her sentence for the

---

[26] *See supra* n.15.

35

felony including any court ordered term of parole, supervision and probation.

The indictment sufficiently tracked the language of the applicable statutes. *Id.* §§ 11.002(a)(4)(A), 64.012(a)(1). Thus, the State did not alter the statutory proof requirements—for purposes of determining a hypothetical jury charge—in the way it worded the indictment. *See Thomas v. State*, 444 S.W.3d 4, 8–9 (Tex. Crim. App. 2014) (explaining that if the State lists only one of multiple manner and means of committing the offense in the indictment, the hypothetically correct jury charge would measure sufficiency of the evidence to prove only the charged manner and means); *Malik*, 953 S.W.2d at 240 (explaining that measuring sufficiency against hypothetically correct jury charge "ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime"). Although much of the State's questioning and proof at trial focused on whether Mason subjectively knew that being on supervised release made her legally ineligible to vote, the State did not plead her subjective belief in the indictment.

Mason does not dispute that she filled out the Affidavit of Provisional Voter form, signed it, received a provisional ballot pursuant to her statutory right, went to a voting machine and selected her preference, and deposited the provisional ballot in the box marked for it. The evidence also shows that Mason knew she was on supervised release when she did so. *See Thompson*, 9 S.W. at 486–87; *Jenkins*, 468 S.W.3d at 672–73; *Medrano*, 421 S.W.3d at 884–85. The evidence does not show that

she voted for any fraudulent purpose. But the State did not need to prove any motive for her actions. *See Clayton v. State*, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007) (noting that motive is not an essential element of an offense that the State must prove beyond a reasonable doubt); *cf. Ortega v. State*, No. 02-17-00039-CR, 2018 WL 6113166, at *1 (Tex. App.—Fort Worth Nov. 21, 2018, no pet.) (mem. op., not designated for publication) (involving prosecution for illegal voting in which noncitizen, legal permanent resident was able to register and vote twice in Dallas County even though she truthfully indicated on her registration application that she was not a United States citizen). And as we have explained, not knowing the law is no excuse for the conduct prohibited under Election Code Section 64.012(a)(1). Although Mason may not have known with certainty that being on supervised release as part of her federal conviction made her ineligible to vote under Texas law or that so voting is a crime—and although she testified that if she had known she would not have voted—she voted anyway, signing a form affirming her eligibility in the process despite the fact that she was not certain and may not have read the warnings on the affidavit form. Under the plain language of the current law as promulgated by the Texas Legislature, this evidence is sufficient to prove that she committed the offense of illegal voting.

Although Mason's trial counsel suggested generally that she had made "a mistake," Mason has not urged on appeal that the evidence raised either a mistake-of-law affirmative defense or mistake-of-fact defense or that the trial judge's implicit

rejection of either defensive issue is not supported by the evidence. *See* Tex. Penal Code Ann. §§ 2.03(c), 2.04(c), 8.02–.03; *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007); *cf. Doyle v. State*, No. 09-14-00458-CR, 2016 WL 908299, at *4–6 (Tex. App.—Beaumont Mar. 9, 2016, pet. ref'd) (mem. op., not designated for publication) (reviewing sufficiency of jury's rejection of raised mistake-of-law affirmative defense). Nor do we think that the evidence raised either one of them. Mason's claimed lack of knowledge that being on supervised release made her ineligible—as opposed to an argument that she mistakenly did not know she was on supervised release—could not have raised a mistake-of-fact defense because a belief that a proscribed action is not unlawful is not a mistake of fact. *See Vitiello v. State*, 848 S.W.2d 885, 887 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd); *see also* Tex. Penal Code Ann. § 8.02(a) (providing that defense is available if mistake negates culpable mental state for offense). And a mistake-of-law affirmative defense is available only when the defendant acted in reasonable reliance on

> (1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question . . . or (2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

Tex. Penal Code Ann. § 8.03(b). Mason expressly disclaimed relying on the warning language in the provisional-ballot affidavit, and she has not argued at trial or on appeal that she relied on an official statement of the law that led her to reasonably believe

38

that she *was* eligible to vote. Thus, neither a mistake-of-fact defense or a mistake-of-law affirmative defense would be included in the hypothetically correct jury charge by which we must measure the evidence's sufficiency.[27] *See Jenkins*, 493 S.W.3d at 599; *cf.* Tex. Code Crim. Proc. Ann. art. 36.14; Tex. Penal Code Ann. §§ 2.03(c), 2.04(c); *Walters*, 247 S.W.3d at 208–09.

Based on the foregoing, we hold that the evidence is sufficient to support Mason's conviction. We therefore overrule Mason's first two points.

## IV. No HAVA Preemption

Mason argues in her fourth point that to the extent Section 64.012(a)(1) allows her conviction for submitting a provisional ballot, it is preempted by HAVA through

---

[27]But even if some evidence could be considered to raise a mistake-of-law affirmative defense—if the trial judge could have reasonably inferred from the evidence that Mason had read the warnings and if the warnings themselves could be construed as a possible grant of permission by the Secretary of State for purposes of raising the affirmative defense—all of the evidence nevertheless supports a conclusion that Mason did not prove that affirmative defense because the judge could have believed that reliance on the affidavit's warnings to claim eligibility would have been unreasonable. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (providing standard of review for factfinder's rejection of a raised affirmative defense). The warnings make clear that a convicted felon must meet certain conditions before being allowed to vote, and even though the articulation of those conditions in the affirmation did not track the statute exactly, at the very least they should have served their purpose of warning Mason that as a convicted felon, she could still have a legal impediment to voting. *See Doyle*, 2016 WL 908299, at *5–6 (holding that factfinder could have determined that voter's reliance on Attorney General opinion was unreasonable when the opinion clearly explained the residency requirements for voting); *Cook v. State*, No. 09-14-00461-CR, 2015 WL 7300664, at *4–5 (Tex. App.—Beaumont Nov. 18, 2015, pet. ref'd) (mem. op., not designated for publication) (same).

the Supremacy Clause of the United States Constitution[28] and thus of no effect. Although the State correctly points out that Mason did not raise this issue in the trial court, to the extent that the reasoning of *Gutierrez v. State*, 380 S.W.3d 167, 173–79 (Tex. Crim. App. 2012),[29] applies, we address her argument.

The Supremacy Clause mandates that when federal and state law conflict, federal law prevails. U.S. Const. art. VI, cl. 2; *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). And regulations enacted under Congress's properly exercised power under the Elections Clause supersede those of the State that are inconsistent. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9, 133 S. Ct. 2247, 2253–54 (2013). Under the Supremacy Clause, Congress's purpose in enacting a law is "the ultimate touchstone" in a preemption case, *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009), and we presume that Congress did not intend to preempt state law unless Congress clearly and manifestly indicated its intent to do so. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 2129 (1981); *Knox v. Brnovich*, 907 F.3d 1167, 1173–74 (9th Cir.

---

[28]In her reply brief, she also references the Elections Clause of the United States Constitution. U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.").

[29]*Gutierrez* addressed—despite "ordinary principles of waiver or procedural default"—an unpreserved complaint that a community supervision condition "invade[d] a federal prerogative[] in violation of the Supremacy Clause" because a defendant cannot agree to a condition "that the criminal justice system simply finds intolerable and which is, therefore, by definition, not even an option available to the parties." 380 S.W.3d at 175–77.

2018). But such a presumption does not apply to a preemption analysis when Congress has acted pursuant to the Elections Clause; in that case, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre[]emptive intent." *Inter Tribal Council*, 570 U.S. at 14, 133 S. Ct. at 2257 (holding that Arizona law requiring voter registration officials to reject registration application when not accompanied by a state-promulgated citizenship form in addition to form promulgated by federal Election Assistance Commission that NVRA requires states to "accept and use" was preempted by NVRA). Although the Elections Clause empowers Congress to regulate how federal elections are held, it does not authorize Congress to determine voter qualifications, that is, who can vote. *See id.* at 16–17, 133 S. Ct. at 2257–58.

Congress's intent to preempt state law may be explicit or implicit. *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 31, 116 S. Ct. 1103, 1107–08 (1996); *Knox*, 907 F.3d at 1174. Implicit conflict preemption occurs when compliance with both state and federal law is impossible or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377, 135 S. Ct. 1591, 1595 (2015) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 109 S. Ct. 1661, 1665 (1989)); *Knox*, 907 F.3d at 1175. The second circumstance can occur if a state law, although attempting to achieve the same goal as a federal law, enacts an enforcement method that conflicts with the intended federal regulatory system for the federal law, thus "interfer[ing] with

41

the careful balance struck by Congress." *Arizona v. United States*, 567 U.S. 387, 406, 132 S. Ct. 2492, 2505; *Knox*, 907 F.3d at 1175. But when Congress has not created a comprehensive federal program of enforcement for federal legislation, the state has the "authority to pass its own laws on the subject." *Arizona*, 567 U.S. at 404, 132 S. Ct. at 2503; *Knox*, 907 F.3d at 1175.

Mason contends that the purpose of HAVA's provisional-balloting procedure was to shift the burden of determining a voter's eligibility under state law away from that voter to the state officials who determine after the election whether that provisional ballot should count. She claims that "HAVA is designed to permit people who are *unsure* of their eligibility to cast a ballot that will be counted only if that person is later determined, in fact, to be eligible."

Although states generally retain the power to regulate their own elections, *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992), "Congress has erected a complex superstructure of federal regulation atop state voter-registration systems," *Inter Tribal Council*, 570 U.S. at 5, 133 S. Ct. at 2251. HAVA is part of this superstructure. *See* Richard F. Shordt, *Not Registered to Vote? Sign This, Mail It, and Go Hire a Lawyer*, 78 Geo. Wash. L. Rev. 438, 444–48 (2010). HAVA applies only to federal elections and expressly leaves "[t]he specific choices on the methods of complying with the requirements of" the subchapter on election technology and administration, including voter-registration-list maintenance, "to the discretion of the State." 52 U.S.C.A. §§ 21082, 21085 (West 2015); *Broyles v. Texas*, 618 F. Supp. 2d 661,

42

692 (S.D. Tex. 2009), *aff'd*, 381 Fed. App'x 370 (2010); *see* Shordt, *supra*, at 450 ("The NVRA and HAVA did not nationalize the registration process.").

In HAVA, Congress did not expressly evidence an intent to preempt all state laws regarding voter registration, types of ballots allowed, or criminal liability for illegal voting. To begin with, HAVA's requirements are expressly conditioned on a State's voluntarily accepting federal funding for voting systems improvement. 52 U.S.C.A. § 20901 (West 2015). Texas did accept that funding and amended its election laws for the purpose of complying with HAVA. Thus, HAVA requires Texas to use the funds consistently with federal election laws, including the NVRA, and expressly prohibits the state from using the funds inconsistently "with the requirements of subchapter III," entitled Uniform and Nondiscriminatory Election Technology and Administration Requirements, in which the provisional-balloting procedure is established. *Id.* §§ 20901(c), 21082, 21145 (West 2015). But, again, nothing in the NVRA or Subchapter III of HAVA expressly preempts a state from imposing criminal liability for a person's voting, regularly or provisionally, while ineligible. Thus, we must consider whether Texas's prosecution of a provisional voter like Mason under its illegal-voting statute creates an obstacle to the accomplishment and execution of Congress's full purposes and objectives under HAVA.

Like the NVRA, one of HAVA's main purposes was to increase voter registration and participation of eligible voters by reducing unnecessary procedural, administrative, and technical obstacles to voting. *See* Shordt, *supra*, at 444–48; *see also*

43

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 192, 128 S. Ct. 1610, 1617 (2008) ("In the [NVRA] Congress established procedures that would both increase the number of registered voters and protect the integrity of the electoral process." (citation omitted)). HAVA expanded upon the NVRA's attempt to enhance states' voter-registration-list maintenance procedures by adding additional restrictions on when names can be purged from voter rolls. *See* Shordt, *supra*, at 448; *see also* 52 U.S.C.A. § 21083(a)(2). But HAVA "does not impose any federal standards on voter registration or voter eligibility, both of which remain state decisions." *Browning*, 522 F.3d at 1170. Furthermore, HAVA expressly requires a provisional voter to affirm that the voter is both registered and eligible under state law—thus placing that person at risk of federal and state criminal liability if the information is false. 52 U.S.C.A. § 21082(a); *see* 52 U.S.C.A. § 20511(2) (West 2015); Tex. Elec. Code Ann. §§ 13.007, 276.013(a)–(b).

We conclude that Congress did not evidence an explicit or implicit intent in HAVA's mandated provisional-ballot procedure to preempt state laws that allow illegal-voting prosecutions of persons who are ineligible under state law, nor did Congress, in enacting HAVA, intend to place the burden to determine a voter's state-law eligibility to vote solely on the state officials later charged with counting provisional ballots. Rather, HAVA's provisional-ballot system was created to assist voters who would otherwise be eligible under state law in registering to vote and to facilitate eligible persons' right to vote without being turned away at the polls by

44

election officials.[30] Here, the election workers in this case did not turn Mason away when they could not find her name on the list of registered voters and instead complied with HAVA's and the Texas Election Code's requirements to offer her a provisional ballot so long as she affirmed—as required by both HAVA and the Texas Election Code—that she was registered and eligible to vote.

Because we conclude that HAVA's provisional-ballot procedure does not preempt Mason's prosecution under state law, we overrule Mason's fourth point.

## V. Ineffective Assistance of Counsel

In her fifth point, Mason contends that her trial counsel was ineffective for several reasons: (1) failing to move to quash the indictment; (2) failing to move for a directed verdict; (3) failing to present evidence of her lack of knowledge and intent; (4) failing to "explore" (i.e., ask follow-up questions concerning) election judge Dietrich's potential bias against her; and (5) having an actual conflict of interest.

---

[30]During his testimony, Dietrich indicated that he had attempted to confirm Mason's registration status by looking her up in the online voter database. Although he was unable to find her name in the database and thus confirm her as a registered voter, Dietrich did not call the TCEA to access Mason's registration history, as he had with another ineligible voter that day whose name he was able to find in the database (and to whom he was therefore able to communicate the reason for his ineligibility—that although he was registered, he had not registered at least thirty days before the election). Had Mason's name been in the database, thus prompting Dietrich to call the TCEA, its representative presumably would have been able to give him the same type of information from TCEA's computerized voter-registration system—that Mason's registration had been cancelled because she was on the "SOS Felon List."

## A. Preservation

The State contends that Mason preserved only the two ineffective-assistance complaints that she included in her motion for new trial, citing cases in which the appellate complaint was whether the trial court erred in its ruling on a new-trial motion. *See State v. Arizmendi*, 519 S.W.3d 143, 150–51 (Tex. Crim. App. 2017); *State v. Moore*, 225 S.W.3d 556, 569–70 (Tex. Crim. App. 2007); *Hamilton v. State*, 804 S.W.2d 171, 174 (Tex. App.—Fort Worth 1991, pet. ref'd). But an appellant may raise an ineffective assistance complaint, outside of the new-trial context, for the first time on appeal. *See Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000); *Reyes v. State*, 361 S.W.3d 222, 232 (Tex. App.—Fort Worth 2012, pet. ref'd). Accordingly, we will review all of Mason's appellate complaints of ineffective assistance.

## B. First through fourth alleged ineffective grounds

### 1. Standard of review

To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that her counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his

actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

## 2. Failure to move to quash indictment

Mason contends that her trial counsel should have moved to quash the indictment because the indictment alleges conduct not prohibited by the statute, i.e., "voting while under *court ordered* parole or supervision." [Emphasis added.] She contends that because Section 11.002(a)(4)(A) specifies a court order only for probation—by requiring that the person must have "fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court"—the statute does not contemplate court-ordered supervision as part of a sentence that must be completed before a felon regains the right to vote.

Mason is arguing, in essence, that the statute precludes court-ordered supervised release from disqualifying someone from regaining the right to vote under

47

Section 11.002(a)(4)(A); thus, the indictment failed to allege an offense.[31] But as we have explained, the statute disqualifies a convicted felon from voting if she has not completed her entire "sentence." Courts impose sentences, including federal supervised release. *See* Tex. Code Crim. Proc. Ann. arts. 42.01, § 1, 42.02; *see also* 18 U.S.C.A. § 3583(a). It would be contrary to the statute's plain meaning to construe it otherwise. *See Campbell*, 49 S.W.3d at 876; *cf. Tapps v. State*, 294 S.W.3d 175, 177 & n.10 (Tex. Crim. App. 2009) (reciting basic principle that courts stray from statute's literal text only when not doing so would lead to absurd consequences). Thus, we conclude that trial counsel was not deficient for failing to challenge the indictment on this basis.

### 3. Failure to move for directed verdict

Mason also argues that her counsel was ineffective for failing to move for a directed verdict. Because we have already held that the evidence is sufficient to support the trial court's guilt finding, we likewise hold that trial counsel was not ineffective for failing to move for a directed verdict. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (holding that a challenge to a trial court's ruling on a directed verdict motion is a challenge to the sufficiency of the evidence to support conviction); *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990); *see also*

---

[31]An indictment must state facts that, if proved, show a violation of the law; if it does not, the court must dismiss the indictment. *See Posey v. State*, 545 S.W.2d 162, 163 (Tex. Crim. App. 1977); *Rotenberry v. State*, 245 S.W.3d 583, 586 (Tex. App.—Fort Worth 2007, pet. ref'd); *see also* Tex. Code Crim. Proc. Ann. art. 21.01 (defining indictment as a grand jury's written statement accusing a person of an act or omission that is a legal offense).

*Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) (holding counsel is not required to engage in the filing of futile motions); *Carreon v. State*, No. 04-18-00415-CR, 2019 WL 3805507, at *4 (Tex. App.—San Antonio Aug. 14, 2019, no pet.) (mem. op., not designated for publication) (holding trial counsel not deficient for failing to request a directed verdict after determining that conviction supported by sufficient evidence); *Zarnfaller v. State*, No. 01-15-00881-CR, 2018 WL 3625618, at *20 (Tex. App.—Houston [1st Dist.] July 31, 2018, no pet.) (mem. op., not designated for publication) (same).

Moreover, the record in this case does not indicate why trial counsel did not move for a directed verdict. Without evidence providing trial counsel's explanation for not doing so, we cannot conclude that counsel was deficient. *See Thompson*, 9 S.W.3d at 813–14.

### 4. Failure to present evidence of lack of knowledge and intent

Mason contends her trial counsel was ineffective for failing to call additional witnesses to testify to her lack of subjective knowledge and intent to vote illegally. But, as we have explained, her subjective knowledge that voting while on post-imprisonment supervised release was illegal is irrelevant to her conviction. Thus, we likewise hold that counsel was not deficient for failing to call additional witnesses to show her lack of knowledge and intent.

## 5. Failure to explore Dietrich's alleged bias

Mason further contends that her trial counsel was ineffective for failing to question Dietrich "about his improper communication with the court" after the trial judge informed the parties at the close of Dietrich's testimony that he knew Dietrich personally and that he had seen Dietrich "at the Republican conv[en]tion for Senate District 10," where Dietrich told the trial judge "that . . . [he] was going to see him." But the trial judge explained that he "didn't know [in] what context" he would be seeing Dietrich. Mason's trial counsel did not object or ask to question Dietrich further. He told the judge, "I understand. I have no problem with that."

According to Mason, Dietrich—her neighbor—knew her well and knew she had gone to prison but nevertheless allowed her to fill out a provisional ballot without raising any concern with her about her ineligibility to vote; instead, he "waited a few days and contacted the District Attorney." She appears to argue that had trial counsel questioned Dietrich about the encounter, he could have uncovered evidence that Dietrich was biased against Mason and had an improper motive to report her and testify untruthfully against her.[32]

Dietrich did not testify at the evidentiary hearing on the motion for new trial. But the State had already questioned him on redirect at trial about his reporting of Mason. According to Dietrich, he had no reason to suspect when Mason voted that

---

[32]Mason's inference is that Dietrich had attempted to improperly influence the trial judge and therefore must have had a bias in favor of prosecuting and convicting her.

she was a convicted felon or was on supervised release and could not vote for that reason; he knew that she "had had something previously, but it was a long time ago, and [he] wasn't even sure whether there had been a conviction."[33] After Mason voted, a worker at the polling place told Dietrich that he was concerned about Mason's voting, prompting Dietrich to call the Tarrant County District Attorney's office the day after the election. When asked if he would have turned Mason away if he had known of her ineligibility, Dietrich said that his training gives him three choices—to let the person vote normally if the person is on the registered voters list and has a valid driver's license, to direct that person to the correct polling location if the person is in the wrong one based on her residence address, or to allow the person to vote provisionally.

At the new-trial hearing, Mason's trial counsel testified that Dietrich was on the witness list; that he had read the names of all the witnesses to Mason before trial and she did not say she knew Dietrich; and that when Dietrich testified, she wrote counsel a note to say that Dietrich was her neighbor. Counsel said that when the judge told the attorneys about his interaction with Dietrich, the judge was "open about it," and counsel did not think "the judge ever said he [had] discussed [the case] with" Dietrich. He did not ask any follow-up questions because the interaction did not disqualify the judge and it was not relevant to the defense.

---

[33]At the time of the election, Dietrich had recently returned from a military tour of Afghanistan.

Mason contends that Dietrich's "motive to color the truth of his testimony in a highly political case such as this one is absolutely central to [her] defense." Mason's defense was that she did not know she was ineligible to vote; part of that defense was to show that she had not read the affidavit before she signed it. The only significant differences between Mason's testimony and Dietrich's had to do with whether he helped her fill out the provisional ballot (his testimony) or whether another worker did (Mason's testimony) and with whether he was lying when he said Mason "appeared" to read the affidavit language admonishing of the eligibility requirements before she signed the Affidavit of Provisional Voter.[34] But as we have said, the law does not require that Mason have had subjective knowledge that she was legally ineligible to vote, only that she knew she was still on supervised release when she voted. Mason herself testified that she had signed the affidavit form and cast a provisional ballot. Moreover, the worker who alerted Dietrich to the fact that Mason could have improperly voted testified at trial that Mason voted provisionally, that he watched Mason looking at the form, and that he saw "[h]er finger watching[35] each line making sure she read it all." Thus, whether Dietrich had an improper motive to allow Mason to vote, to testify that he thought she had read the affidavit, or to alert the District Attorney's office that she had voted would not have affected Mason's

---

[34]He had testified at trial that he thought she had read the affidavit because she "paused and took some number of seconds to look over" the left side of the affidavit form—the side with the eligibility warning.

[35]We assume he meant "following" each line.

defense. We conclude that counsel was not ineffective for failing to question Dietrich further after the trial judge's disclosure.

## C. Actual conflict of interest

Finally, Mason argues that her trial counsel had an actual conflict of interest requiring a new trial.

### 1. Standard of review specific to attorney–client conflicts claims

An attorney's conflict of interest may result in the denial of a defendant's right to effective assistance of counsel. *Acosta v. State*, 233 S.W.3d 349, 352–53 (Tex. Crim. App. 2007). To prevail on a conflicts-based ineffective-assistance claim, an appellant must show (1) that an actual conflict of interest existed and, (2) in most circumstances, that it "actually colored counsel's actions during trial." *Odelugo v. State*, 443 S.W.3d 131, 136 (Tex. Crim. App. 2014) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708 (1980)). When a trial judge knows or reasonably should know that a "particular conflict" exists, such as when an attorney or party brings the matter to the judge's attention, the judge must adequately inquire whether the risk that the conflict could adversely affect counsel's representation warrants new counsel; this duty is not triggered if the judge "is aware of [only] a vague, unspecified possibility of conflict." *Mickens v. Taylor*, 535 U.S. 162, 168–69, 122 S. Ct. 1237, 1242 (2002) (citing *Cuyler*, 446 U.S. at 347–48, 100 S. Ct. at 1717–18). Thus, two conflicts-based ineffective-assistance complaints are possible: (1) that the trial court did not conduct an adequate investigation into whether an actual conflict created enough risk of affecting counsel's

representation that new counsel was necessary or (2) that an actual conflict adversely affected counsel's representation. *See Johnson v. State*, 583 S.W.3d 300, 313–17 (Tex. App.—Fort Worth 2019, pet. ref'd) (reviewing whether actual conflict existed but declining to review adequacy of trial court's inquiry because not raised on appeal); *Orgo v. State*, 557 S.W.3d 858, 862 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that trial court adequately inquired into potential conflict and that no actual conflict existed). Mason has raised the second type of complaint.

An actual conflict of interest exists when counsel must choose between "advancing his client's interest in a fair trial or advancing other interests (perhaps counsel's own) to the [client's] detriment." *Odelugo*, 443 S.W.3d at 136; *Acosta*, 233 S.W.3d at 355. Mason's argument at trial and on appeal is that counsel had an actual conflict because he had represented her in the federal case, he knew he had told her then that she was ineligible to vote, and he was therefore a fact witness as to the truthfulness of her subjective belief on November 8, 2016, that she could vote.

### 2. No actual conflict of interest

Trial counsel testified at the new-trial hearing that he had told Mason when she was deciding whether to plead guilty to the federal offense that she would not be able to vote after her conviction. But he had no idea whether she remembered that conversation four years later when she actually voted. Despite Mason's appellate

counsel's[36] best efforts to equate trial counsel's telling Mason in 2012 that she would not be able to vote after her conviction with knowledge that Mason was actually aware *in 2016* that she could not vote, appellate counsel elicited no evidence that trial counsel knew that Mason actually remembered in 2016 what he had told her in 2012.

Regardless, trial counsel's knowledge that he had told her in 2012 that she would not be able to vote after being convicted of a felony was not relevant to her defense that in 2016 she did not know that being on supervised release made her ineligible under the law—a defense that was not based on the statute, which as we have explained does not require the State to show a defendant's subjective knowledge of the law absent evidence raising a mistake-of-law affirmative defense. Thus, Mason has not shown that her trial counsel was laboring under an actual conflict of interest.

## D. No deficient performance

Having found no support in the record for Mason's claims of deficient performance by her trial counsel, we overrule her fifth point contending that we should reverse her conviction because her trial counsel was ineffective. *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069 (noting that we need not address both parts of the test if the appellant makes an insufficient showing on one component).

---

[36]Mason's lead appellate counsel filed and argued her motion for new trial.

## VI. Void-for-Vagueness Complaint Not Preserved

Mason argues in her third point that Section 64.012(a)(1) is unconstitutionally vague as applied under the United States Constitution. But this complaint must have been timely raised in the trial court for us to be able to consider it on appeal. *See Reynolds v. State*, 423 S.W.3d 377, 383 (Tex. Crim. App. 2014). Mason raised the unconstitutional-vagueness complaint in an untimely amended motion for new trial, which she withdrew after the State objected to its untimeliness. Thus, under well-established rules of procedural default, we may not review this complaint. *See Arizmendi*, 519 S.W.3d at 150 (noting that although a motion for new trial may be amended any time within thirty days after sentence is imposed or suspended in open court, "the trial court is barred from considering a ground raised outside the thirty-day period if the State properly objects"); *Moore*, 225 S.W.3d at 570. We overrule Mason's third point.

## VII. Conclusion

The decision to prosecute is, in most cases, beyond this court's capacity to review. *See Wayte v. United States*, 470 U.S. 598, 607, 105 S. Ct. 1524, 1530 (1985) (noting that the government retains broad discretion to decide who it will prosecute so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute). Likewise, ours is not to question an unambiguous statute's wisdom but rather to apply it as written. *See, e.g., Jones v. Del Anderson & Assocs.*, 539

S.W.2d 348, 351 (Tex. 1976). Accordingly, having addressed and overruled all of Mason's properly preserved points, we must affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Publish

Delivered: March 19, 2020